DECISION.
{¶ 1} Defendant-appellant Fernando Cabrales appeals his convictions for two counts of trafficking in marijuana,[1] one count of possession of marijuana,[2] and one count of conspiracy.[3] We affirm Cabrales's conviction, but sustain his challenge to part of his sentence, and remand to the trial court for resentencing.
 I. Six Assignments of Error {¶ 2} Cabrales argues that the trial court erred by (1) overruling his motion to suppress the evidence seized from his house in California; (2) convicting him when Ohio lacked jurisdiction to charge him with conspiracy; (3) sentencing him on allied offenses of similar import (possession of, transportation of, and offering to sell the same drugs); (4) refusing a jury instruction on the lesser-included offense of attempt under one count of trafficking; (5) allowing a conviction that was based on insufficient evidence and was against the weight of the evidence, and failing to grant his motion for an acquittal; and (6) imposing consecutive sentences.
 {¶ 3} Because trafficking in violation of R.C. 2925.03(A)(2) and possession in violation of R.C. 2925.11(A) are allied offenses of similar import, we vacate the separate sentences for these offenses and remand so that the trial court can merge the offenses for a single sentence. And in light of the Ohio Supreme Court's decision in State v.Foster,[4] we must also vacate the remaining sentences and remand for resentencing. With respect to Cabrales's other assignments of error, they are without merit and overruled. *Page 2 
 II. Smuggling Marijuana into Ohio {¶ 4} On March 26, 2004, Officer Thomas Canada of the Regional Narcotics Unit ("RENU") stopped a car driven by Sean Matthews for crossing lane lines several times on Interstate 74. (RENU is a task force that is made up of officers from the Hamilton County Sheriff's Department and the Cincinnati Police Department and that targets drug traffickers in Hamilton County.) Matthews's car had just crossed the Indiana-Ohio border when Officer Canada noticed the erratic driving.
 {¶ 5} Officer Canada approached the car and asked Matthews for his driver's license. He noticed that Matthews was very tired and asked where he was coming from and where he was going. Matthews stated that he was coming from Arizona and going to Columbus, Ohio, to visit a friend. When Officer Canada asked who the friend was, Matthews was uncertain.
 {¶ 6} Because people generally know whom they are visiting, Officer Canada's suspicion was aroused by Matthews's response. Officer Canada walked back to his vehicle to check Matthews's license. When he approached Matthew's car for a second time, he noticed a marijuana odor. Officer Canada then asked Matthews and his companion, James Longenecker, to get out of the car.
 {¶ 7} At this time, Agent Arnold arrived with a drug-sniffing dog. When Officer Canada asked Matthews if he could search the car, Matthews responded, "If you wish." Because Officer Canada did not get a clear affirmative answer to the search request, he asked Agent Arnold to walk his dog around the car. The dog indicated a scent on the left rear passenger door. In Officer Canada's view, this gave him the probable cause he needed to investigate further. *Page 3 
 {¶ 8} Underneath a stack of clothes in the back seat was a black duffle bag that emitted a marijuana odor. A subsequent search of the entire car resulted in the confiscation of three duffle bags containing over 300 pounds of marijuana. Matthews and Longenecker were arrested and taken to a police station for questioning.
 {¶ 9} During their questioning of Longenecker, the officers discovered that he had been delivering marijuana for a man known as Boo Boo (also known as Bow Bow). Both Matthews and Longenecker agreed to cooperate with RENU by attempting to complete the marijuana delivery. Because Longenecker had completed other deliveries for Boo Boo in the past (from California to Denver), and because it was Matthews's first experience transporting narcotics, the police asked Longenecker to place recorded phone calls to Boo Boo and to complete the delivery.
 {¶ 10} Officer Steven Lawson, an undercover narcotics investigator with RENU, took Matthews's place as the driver of the vehicle. After Longenecker resumed contact with Boo Boo, he explained that rainy weather and traffic had delayed their arrival in Cincinnati. Boo Boo seemed to understand and instructed Longenecker to take the marijuana to a hotel parking lot in the Kenwood suburb. Boo Boo was recorded as stating that a man named Mundy, driving a silver Honda, would meet them and pick up the marijuana at the hotel parking lot.
 {¶ 11} A person later identified as Mundy Williams eventually arrived at the hotel parking lot in a silver Honda, but refused to accept delivery at that location. He asked Longenecker and Officer Lawson to follow him to a nearby house to complete the delivery. But Officer Lawson refused to follow him to another location (for safety reasons and because the police were in position at the hotel parking lot). *Page 4 
 {¶ 12} Williams became angry that Longenecker and Officer Lawson were not going to follow him to another location, and he attempted to leave. But RENU officers stopped and arrested him before he could exit from the parking lot.
 {¶ 13} After Williams's arrest, Longenecker was further questioned about his trafficking activities. Longenecker told the police that he had transported drugs for Boo Boo approximately six to seven times over the previous year, and that he had typically driven the drugs from California to Colorado. When Boo Boo had contacted him about this transport from California to Ohio, Longenecker enlisted the help of Matthews because he knew it would require a long drive.
 {¶ 14} Longenecker testified that he and Matthews had driven to Boo Boo's residence on March 24, 2004. They then went to the residence of a person whom he only knew by the name of Jessie. At this house, Longenecker and Boo Boo loaded the car that Matthews had borrowed from a friend with three duffle bags filled with marijuana. Two of the bags fit in the trunk, but the third had to be placed in the back seat.
 {¶ 15} After getting some sleep, Longenecker and Matthews began to drive nonstop from California to Ohio on the morning of March 25. Throughout the trip, Longenecker kept in contact with Boo Boo by using Matthews's cellular phone. While the original route was supposed to end in Cleveland, Boo Boo called while Longenecker and Matthews were in Indiana, and instructed them to change the delivery to Cincinnati. Almost immediately after they crossed the Indiana-Ohio border on I-74, RENU officers stopped the vehicle based on Matthews's erratic driving. *Page 5 
 {¶ 16} With the information Longenecker provided about Boo Boo's description, residence, family, and vehicles, RENU contacted the Riverside, California, police department. The Riverside police believed that the physical description matched Fernando Cabrales. Cabrales's picture was sent by e-mail to RENU officers, and both Longenecker and Matthews separately identified Fernando Cabrales as the "Boo Boo" they had been in contact with throughout the transaction.
 {¶ 17} Riverside police obtained a search warrant, and Hamilton County obtained an arrest warrant for Fernando Cabrales. He was arrested on March 31, during a search of his residence. No drugs or cash was seized, but the cellular phone that was used to place the calls between Boo Boo and Longenecker was found in Cabrales's home and seized.
 {¶ 18} Cabrales testified in his own defense at trial. He claimed that he had no idea what Longenecker had been delivering, but that he believed that the merchandise might have included clothing. While he admitted to being the voice on the recorded telephone calls, he claimed that he had merely been offering translation services between Longenecker and another party. The jury did not believe this defense and found Cabrales guilty on all charges. He was sentenced to 24 years' incarceration.
 III. Motion to Suppress {¶ 19} In his first assignment of error, Cabrales argues that the trial court erred by overruling his motion to suppress any evidence seized from the search of his residence on March 31, 2004. Cabrales maintains that the affidavit used to obtain a search warrant contained no probable cause to believe that either drugs or money *Page 6 
related to the alleged offenses would be found on the premises. Cabrales's assignment is without merit.
 {¶ 20} Appellate review of a suppression ruling involves mixed questions of law and fact.[5] When ruling on a motion to suppress, the trial court serves as the trier of fact and is the primary judge of the credibility of the witnesses and the weight of the evidence.[6] An appellate court must accept the trial court's findings of fact if they are supported by competent and credible evidence.[7] But the appellate court must then determine, without any deference to the trial court, whether the facts satisfy the applicable legal standard.[8]
 {¶ 21} In determining whether a search warrant was adequately supported by probable cause, the reviewing court's duty is merely to ensure that the issuing magistrate or judge had a substantial basis for concluding that probable cause existed.[9] This standard of review grants a great deal of deference to the issuing magistrate.[10]
 {¶ 22} To establish probable cause to issue a search warrant, an affidavit must contain sufficient information to allow a magistrate to draw the conclusion that evidence is likely to be found at the place to be searched.[11] Probable cause exists when a reasonably prudent person would believe that there is a fair probability that the place to be searched contains evidence of a crime.[12]
 {¶ 23} In the present case, the affidavits used to secure the search and arrest warrants were prepared after Longenecker and Matthews had been arrested and had *Page 7 
provided the police with detailed information about Cabrales. The affidavit for the search warrant accurately described Cabrales's primary residence. Both Longenecker and Matthews identified Cabrales's picture as the man they knew as "Boo Boo." They detailed how Cabrales had led them to Jessie's residence to pick up the marijuana and how they were in constant contact with Cabrales throughout their drive from California to Ohio. Longenecker also attested that Cabrales had directed him to deliver the drugs to a hotel parking lot in Kenwood, and that a person named Mundy in a silver Honda would be there to pick up the drugs.
 {¶ 24} According great deference to the judge authorizing the search warrant, we hold that the incidents described in the affidavit provided a substantial basis to conclude that probable cause existed to issue the warrant. All of Cabrales's instructions demonstrated his intimate knowledge of the delivery of 300 pounds of marijuana from California to Ohio. Thus the trial court did not err in overruling Cabrales's motion to suppress, and his first assignment of error is overruled.
 IV. Jurisdiction {¶ 25} Cabrales's second assignment of error contends that the trial court erred by denying his motion to dismiss for lack of jurisdiction under R.C. 2901.11 and for failure to state an offense in count four of the indictment.
 {¶ 26} Under R.C. 2901.11, a person is subject to criminal prosecution and punishment in Ohio if "while out of this state, the person conspires or attempts to commit, or is guilty of complicity in the commission of, an offense in this state." While Cabrales argues that there was no evidence that he knew that drugs were being sold or offered for sale in Ohio, all the evidence pointed to the contrary: (1) *Page 8 
Longenecker and Matthews were constantly in contact with Cabrales by cellular phone; (2) Cabrales instructed Longenecker and Matthews where to deliver the marijuana; and (3) he provided a description of the person who would be waiting for the marijuana in Cincinnati, as well as the type of car that person would be driving. These facts illustrate that Cabrales was actively involved in a conspiracy to transport over 300 pounds of marijuana into Hamilton County.
 {¶ 27} Additionally, the trial court did not err in overruling Cabrales's motion to dismiss count four for failure to state an offense. Count four of the indictment stated that Cabrales, "with purpose to commit or to promote or to facilitate the commission of aggravated trafficking and possession, agreed with another person or persons * * * that one or more of them would engage in conduct that facilitate[d] the commission of any of the specified offenses, and subsequent to [their] entrance into such plan or agreement, a substantial overt act, to wit: the transport of marihuana from California to Hamilton County in furtherance of the conspiracy was committed by the defendant or another person or persons." (Marijuana is spelled with an "h" in the statute. We note that both spellings are acceptable.)
 {¶ 28} Under R.C. 2921.01(A), conspiracy prohibits a person from purposely committing, promoting, or facilitating the commission of "felony drug trafficking, manufacturing, processing, or possession offense[s]." Thus the indictment incorrectly used the wording "aggravated trafficking and possession" instead of "felony drug trafficking, manufacturing, processing, or possession." The trial court granted the state's motion to amend the indictment to substitute the word "felony" for the word "aggravating" so that the charge would conform with R.C. 2923.01(A). *Page 9 
 {¶ 29} Crim.R. 7(D) provides that "[t]he court may at any time before, during, or after a trial amend the indictment * * * in respect to any defect, imperfection or omission in form or substance, or of any variance with the evidence, provided no change is made in the name or identity of the crime charged." Here, the trial court could have amended the indictment so long as the amendment did not change the name or identity of the crime charged.[13]
 {¶ 30} In this case, the trial court allowed the amendment merely to substitute the word "felony" for "aggravating." This amendment did not alter the name or identity of the crime charged. The amendment did not add any additional elements that the state was required to prove. And Cabrales has been unable to show that he had been misled or prejudiced by the amendment. Cabrales had notice of both the offense and the applicable statute. Accordingly, the second assignment of error is overruled.
 V. Allied Offenses of Similar Import {¶ 31} In his third assignment of error, Cabrales argues that the possession of, transportation of, and offering to sell the same drugs are allied offenses of similar import under R.C. 2941.25(A), and that no separate animus existed for the commission of each of these crimes. As a result, Cabrales contends that he should not have been sentenced separately for each crime. In support of his argument, Cabrales relies on our decision in State v. Jennings,[14] where we held that a defendant may be indicted for both possession and trafficking, but that if the charges stem from a single transaction involving the same type and quantity of drugs, there can only be *Page 10 
one conviction under R.C. 2941.25(A).[15] Cabrales's reliance onJennings is misplaced because it was superseded by the Ohio Supreme Court's decision in State v. Rance.[16] But Cabrales is correct that trafficking in drugs in violation of R.C. 2925.03(A)(2) and possession of drugs in violation of R.C. 2925.11(A) are allied offenses of similar import.
 {¶ 32} R.C. 2941.25(A) provides, "Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment * * * may contain counts for all such offenses, but the defendant may be convicted of only one."
 {¶ 33} In Rance, the Ohio Supreme Court held that to determine whether crimes are allied offenses of similar import under R.C. 2941.25(A), courts must assess "whether the statutory elements of the crimes correspond to such a degree that the commission of one crime will result in the commission of the other."[17] The Rance test requires a strict textual comparison of the statutory elements, without reference to the particular facts of the case, to determine if one offense requires proof of an element that the other does not. If the elements do correspond, the defendant may be convicted and sentenced for only one offense, unless the court finds that the defendant committed the crimes separately or with separate animus.[18] Therefore, we must determine whether the possession and trafficking counts involved allied offenses of similar import or whether the charged offenses were committed separately or with separate animus.[19] *Page 11 
 {¶ 34} Since Rance, we have held that possession and trafficking in the same type and quantity of a controlled substance are not allied offenses, because when the elements of each offense are compared in the abstract, each requires proof of a fact that the other does not.[20]
But this analysis was restricted to trafficking in violation of R.C.2925.03(A)(1) — selling or offering to sell a controlled substance — and did not involve trafficking in violation of R.C. 2925.03(A)(2) — preparing for shipment, shipping, transporting, delivering, preparing for distribution, or distributing a controlled substance.
 {¶ 35} A possession charge only requires proof that a defendant obtained, possessed, or used a controlled substance, while a trafficking charge under R.C. 2925.03(A)(1) requires proof that the defendant was either selling or offering to sell the controlled substance. The added mens rea of intending to sell or offering to sell the controlled substance is the differentiating element. As we have said previously, "It is possible to possess [marijuana] without offering it for sale, and it is possible to sell or offer to sell [marijuana] without possessing it, e.g., when one serves as a middleman."[21] Accordingly, possession and trafficking in violation of R.C. 2925.03(A)(1) are not allied offenses of similar import.
 {¶ 36} But Cabrales also claims that possession of drugs in violation of R.C. 2925.11(A) and trafficking in drugs in violation of R.C.2925.03(A)(2) are allied offenses of similar import. We agree. Although the Tenth and Twelfth Appellate Districts have ruled otherwise,[22]
for a person to commit a trafficking offense in *Page 12 
violation of R.C. 2925.03(A)(2), that person would also have to violate R.C. 2925.11(A) — possession of drugs. The trafficking statute prohibits a person from preparing for shipment, shipping, transporting, delivering, preparing for distribution, or distributing a controlled substance when the defendant knows or reasonably believes that the controlled substance is intended for resale. For a person to prepare for shipment or transport drugs, that person would necessarily have to possess the drugs. The statutory elements of these crimes correspond to such a degree that the commission of one crime will result in the commission of the other.
 {¶ 37} Thus, Cabrales's third assignment of error is sustained as to possession of drugs in violation of R.C. 2925.11(A) and trafficking in drugs in violation of R.C. 2925.03(A)(2). We reverse the sentences for these offenses and remand this case so that the trial court may resentence Cabrales in accordance with this decision — so that Cabrales is sentenced for only one of these offenses.
 {¶ 38} We also note that Cabrales claims that the two counts of trafficking involved allied offenses, and that he should not have been sentenced separately for these offenses. But Cabrales was charged under two separate subsections of R.C. 2925.03(A). Subsection (1) forbids a person from selling or offering to sell a controlled substance, while subsection (2) prohibits a person from preparing for shipment, shipping, transporting, delivering, preparing for distribution, or distributing a controlled substance when the defendant knows or reasonably believes that the controlled substance is intended for resale. Because Cabrales needed a separate animus to commit each crime — offering to sell and transporting — these crimes were not allied offenses of similar import. *Page 13 
 VI. Lesser-Included Offense {¶ 39} Cabrales's fourth assignment of error argues that the trial court erred by refusing his request for a jury instruction on the lesser-included offense of attempt under count one of the indictment — the trafficking count that prohibited him from selling or offering to sell a controlled substance. Cabrales contends that the jury could have found that he had not offered the drugs for sale, or had even known that a sale was involved, but that he knew or should have known that the drugs were being delivered. Cabrales further rationalizes that since the delivery was never completed, the jury would likely have found him guilty only of attempting to traffick in a controlled substance. Cabrales's argument is without merit.
 {¶ 40} We note the oddity of this question — how does a personattempt to offer to sell a controlled substance? Doesn't a person merely offer to sell the drug, not attempt to offer to sell? It seems the answer is within the statute.
 {¶ 41} R.C. 2925.03(A)(1) prohibits a person from selling oroffering to sell a controlled substance. For purposes of R.C.2925.03(A)(1), the phrase " `offer to sell a controlled substance,' simply means to declare one's readiness or willingness to sell a controlled substance or to present a controlled substance for acceptance or rejection."[23] And for a person to be convicted of trafficking, the delivery of the narcotics need not be completed. As the Ohio Supreme Court has stated, "A person can `offer to sell a controlled substance' in violation of R.C. 2925.03(A)(1) without transferring a controlled substance to the buyer. "[24] Thus the statute subsumes an attempt to traffick in a controlled substance within its definition — there does not need to be an actual delivery. *Page 14 
 {¶ 42} Additionally, the state presented sufficient evidence at trial from which the jury could reasonably have inferred that Cabrales had acted as a conspirator in offering to sell a controlled substance in violation of R.C. 2925.03(A)(1). Cabrales was constantly in contact with Longenecker and Matthews by cellular phone, he instructed Longenecker and Matthews where to deliver the marijuana, and he provided descriptions of the person and the car that were to be waiting for the marijuana in Cincinnati. These facts illustrate that Cabrales was actively involved in a conspiracy to transport over 300 pounds of marijuana into Hamilton County.
 {¶ 43} Accordingly, the trial court did not err in refusing to instruct the jury on attempt, and we overrule Cabrales's fourth assignment of error.
VII. Sufficiency and Weight; Crim.R. 29 Motion for Acquittal
 {¶ 44} In his fifth assignment of error, Cabrales argues that there was insufficient evidence to convict him, that his conviction were against the manifest weight of the evidence, and that the trial court erred by denying his Crim.R. 29 motion for an acquittal.
 {¶ 45} When reviewing the sufficiency of the evidence to support a criminal conviction, we must examine the evidence admitted at trial in the light most favorable to the state. We must then determine whether that evidence could have convinced any rational trier of fact that the essential elements of the crime had been proved beyond a reasonable doubt.[25]
 {¶ 46} A review of the weight of the evidence puts the appellate court in the role of a "thirteenth juror."[26] We must review the entire record, weigh the evidence, *Page 15 
consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice.[27] A new trial should be granted only in exceptional cases where the evidence weighs heavily against the conviction.[28]
 {¶ 47} And the standard of review for the denial of a Crim.R. 29(A) motion to acquit is the same as the standard of review for the sufficiency of the evidence. A motion for a judgment of acquittal should not be granted when reasonable minds can reach different conclusions as to whether each element of the crime charged has been proved beyond a reasonable doubt.[29]
 {¶ 48} Cabrales was found guilty of two counts of trafficking in a controlled substance, one count of possession of a controlled substance, and conspiracy. The trafficking statute prohibits a person from knowingly (1) selling or offering to sell a controlled substance, or (2) preparing for shipment, shipping, transporting, delivering, preparing for distribution, or distributing a controlled substance that the person has reasonable cause to believe will be resold.[30] The possession statute forbids a person from knowingly obtaining, possessing, or using a controlled substance.[31] And the conspiracy statute proscribes a person from facilitating and planning with another person the commission of trafficking in or possessing drugs.[32]
 {¶ 49} The state presented the testimony of coconspirators Longenecker and Matthews, as well as the testimony of RENU Officers Canada, Morgan, and Lawson, and of Riverside, California, Police Officer Robert Roggeveen. *Page 16 
 {¶ 50} Longenecker testified that he had transported drugs several times for a man named "Boo Boo," from California to Colorado. He stated that Boo Boo had contacted him in March 2004 to make a delivery to Ohio. Because of the nonstop driving that was involved in the drug delivery, Longenecker had enlisted the assistance of Matthews to make the drive from California to Ohio.
 {¶ 51} Longenecker further testified that he and Matthews had met at Boo Boo's residence on March 24. They then drove to another person's home to pick up three duffle bags of marijuana weighing over 300 pounds. The following day, Longenecker and Matthews began the drive to Ohio. Along the journey, Boo Boo would regularly call to chart their progress. Once Longenecker and Matthews reached Indiana, Boo Boo instructed them to change their delivery destination from Cleveland to Cincinnati. Once they crossed the Indiana-Ohio border, RENU Officer Canada pulled them over for traffic infractions.
 {¶ 52} Officer Canada testified that his suspicions had been aroused when Matthews had failed to answer questions competently. He also had noticed an odor of marijuana when he approached the car for a second time. When Officer Canada was not given a clear affirmative on his request to search the vehicle, he asked Agent Arnold and his drug-sniffing dog to walk around the car. The dog indicated a scent on the left rear passenger door. Officer Canada then searched the car where the dog had indicated, and he found a duffle bag containing marijuana. In all, there was over 300 pounds of marijuana in the vehicle.
 {¶ 53} Longenecker and Matthews both testified that, after they were arrested, they had cooperated with the RENU officers. Officer Lawson sat in the place of Matthews and attempted to make the drug delivery with Longenecker. They *Page 17 
contacted Boo Boo again, and he instructed them to deliver the drugs to a hotel parking lot in Kenwood. Longenecker also testified that Boo Boo had told them that a person named Mundy would pick up the marijuana in a silver Honda.
 {¶ 54} A person later identified as Mundy arrived in the hotel parking lot in a silver Honda, but refused delivery at that location. He wanted Longenecker and Officer Lawson to follow him to a nearby house, but they refused. When Williams became angry that Longenecker and Officer Lawson would not follow him to another location, he attempted to leave. But RENU officers arrested him before he could exit from the parking lot.
 {¶ 55} Based on the information that Longenecker had provided about Boo Boo's description, residence, family, and vehicles, RENU contacted the Riverside, California, police department. The Riverside police believed that the physical description matched Fernando Cabrales. The Riverside police then e-mailed a picture to RENU officers. Both Longenecker and Matthews independently confirmed that Cabrales was the Boo Boo who had organized the transportation of over 300 pounds of marijuana from California to Ohio.
 {¶ 56} Thus, the evidence demonstrated that Longenecker and Matthews were constantly in contact with Cabrales by cellular phone, that Cabrales instructed Longenecker and Matthews where to deliver the marijuana, and that he provided descriptions of the person and car that were to be waiting for the marijuana in Cincinnati. It is clear that Cabrales was actively involved in a conspiracy to transport over 300 pounds of marijuana into Hamilton County.
 {¶ 57} We conclude that a rational factfinder, viewing the evidence in a light most favorable to the state, could have found that the state had proved beyond a *Page 18 
reasonable doubt that Cabrales had possessed, trafficked in, and conspired to deliver over 300 pounds of marijuana in Hamilton County. Therefore, the evidence presented was legally sufficient to sustain the convictions. And the trial court did not err in overruling Cabrales's Crim.R. 29(A) motion.
 {¶ 58} Although Cabrales insists that he was merely translating instructions to Longenecker and Matthews, our review of the record does not persuade us that the trier of fact clearly lost its way and created a manifest miscarriage of justice in finding Cabrales guilty of possession of a controlled substance, two counts of trafficking in a controlled substance, and conspiracy. Therefore, his convictions were not against the manifest weight of the evidence.
 {¶ 59} We overrule Cabrales's fifth assignment.
 VIII. Sentencing {¶ 60} In Cabrales's sixth and final assignment of error, he challenges the trial court's imposition of consecutive sentences. He maintains that the sentences violated his rights to a jury trial and due process as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution, and Sections Five and Sixteen, Article I, of the Ohio Constitution, because the sentences were made consecutive based on facts not determined by a jury or proved beyond a reasonable doubt. Cabrales also contends that the Ohio Supreme Court's decision inState v. Foster,[33] which held that the imposition of consecutive sentences based on judicial factfinding is unconstitutional, retroactively modifies a defendant's sentence in violation of the Ex Post Facto Clause of the United States Constitution. *Page 19 
 {¶ 61} In this case, the trial court imposed consecutive sentences after making findings under R.C. 2929.14(E)(4) that Cabrales's crimes reflected a total disregard for the safety of the public. The court also determined that consecutive terms were necessary to protect the public from future crimes, since it believed that Cabrales had transported drugs into Colorado multiple times and that a return trip to Cleveland had been discussed.
 {¶ 62} In Foster, the Ohio Supreme Court noted that "R.C.2929.14(E)(4) and 2929.19(B)(2)(c) require trial courts that impose consecutive sentences to make the statutorily enumerated findings and to give reasons at the sentencing hearing to support those findings for review on appeal."[34] But because the "total punishment increases through consecutive sentences only after judicial findings beyond those determined by the jury or stipulated to by the defendant, R.C.2929.14(E)(4) violates principles announced in Blakely"[35] and is therefore unconstitutional.
 {¶ 63} The court's remedy was to sever R.C. 2929.14(E)(4) as unconstitutional and to keep the remaining unaffected provisions of the sentencing statutes. After the severance, judicial factfinding is not required before a trial court imposes consecutive prison terms. Trial courts now have full discretion to impose a prison sentence within the statutory range and are no longer required to provide reasons for imposing a sentence involving consecutive prison terms.[36]
 {¶ 64} In this case, the trial court imposed consecutives sentences for possession and the two trafficking offenses after it had made findings based on an unconstitutional statute. We must sustain the assignment of error, vacate the *Page 20 
consecutive sentences, and remand the case for resentencing in light ofFoster. But Cabrales's other argument is without merit. We have previously held that the Ohio Supreme Court's decision inFoster does not violate ex post facto and due process principles.[37]
 {¶ 65} For all the foregoing reasons, we hereby vacate the sentences imposed by the trial court and remand this case for resentencing in light of Foster[38] and for the imposition of only one sentence for the trafficking offense in violation of R.C. 2925.03(A)(2) and the possession offense in violation of R.C. 2925.11(A). In all other respects, the trial court's judgment is affirmed.
Judgment affirmed in part, sentence vacated, and cause remanded for resentencing.
HENDON and WINKLER, JJ., concur.
RALPH WINKLER, retired, from the First Appellate District, sitting by assignment. *Page 21 
[1] R.C. 2925.03(A)(1) and (2).
[2] R.C. 2925.11(A).
[3] R.C. 2923.01(A)(2).
[4] See State v. Foster, 109 Ohio St.3d 1, 2006-Ohio-856,845 N.E.2d 470.
[5] See State v. Burnside, 100 Ohio St.3d 152, 2003-Ohio-5372,797 N.E.2d 71, at ¶ 8.
[6] See State v. Fanning (1982), 1 Ohio St.3d 19, 20,437 N.E.2d 583.
[7] Burnside, supra, at ¶ 8.
[8] Id., citing State v. McNamara (1997), 124 Ohio App.3d 706,707 N.E.2d 539.
[9] See State v. George (1989), 45 Ohio St.3d 325,544 N.E.2d 640.
[10] See State v. Klein (1991), 73 Ohio App.3d 486,597 N.E.2d 1141.
[11] See United States v. Ventresca (1965), 380 U.S. 102,85 S.Ct. 741.
[12] See Illinois v. Gates (1983), 462 U.S. 213, 103 S.Ct. 2317.
[13] Crim.R. 7(D); State v. O'Brien (1987), 30 Ohio St.3d 122, 125-26,508 N.E.2d 144.
[14] See State v. Jennings (1987), 42 Ohio App.3d 179,537 N.E.2d 685.
[15] Id.
[16] See State v. Rance, 85 Ohio St.3d 632, 638, 1999-Ohio-291,710 N.E.2d 699.
[17] Id. at 638.
[18] Id. at 638-39.
[19] Id.
[20] See State v. Foster, 1st Dist. No. C-050378,2006-Ohio-1567; see, also, State v. Salaam, 1st Dist. No. C-020324, 2003-Ohio-1021, and State v. Gonzales, 151 Ohio App.3d 160,2002-Ohio-4937, 783 N.E.2d 903.
[21] Gonzales, 151 Ohio App.3d 160, 2002-Ohio-4937,783 N.E.2d 903.
[22] See State v. Guzman, 10th Dist. No. 02AP-1440, 2003-Ohio-4822; State v. Alvarez, 12th Dist. No. CA2003-03-067, 2004-Ohio-2483.
[23] See State v. Henton (1997), 121 Ohio App.3d 501, 510,700 N.E.2d 371, citing State v. Patterson (1982), 69 Ohio St.2d 445,432 N.E.2d 802.
[24] See State v. Scott (1982), 69 Ohio St.2d 439, 440,432 N.E.2d 798.
[25] See State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.
[26] See State v. Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52,678 N.E.2d 541.
[27] Id., citing Tibbs v. Florida (1982), 457 U.S. 31, 42,102 S.Ct. 2211.
[28] Id.
[29] See Crim.R. 29; see, also, State v. Bridgeman (1978),55 Ohio St.2d 261, 381 N.E.2d 184, syllabus.
[30] R.C. 2925.03(A)(1) and (2).
[31] R.C. 2925.11(A).
[32] R.C. 2923.01(A)(1).
[33] See State v. Foster, 109 Ohio St.3d 1, 2006-Ohio-856,845 N.E.2d 470.
[34] Id. at ¶ 66, citing State v. Comer, 99 Ohio St.3d 463,2003-Ohio-4165, 793 N.E.2d 473.
[35] Id. at ¶ 67.
[36] Id. at ¶ 100.
[37] See State v. Bruce, 1st Dist. No. C-060456, 2007-Ohio-175.
[38] Foster, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470. *Page 1