The STATE of Ohio, Appellee,

v.

MARSHALL, Appellant.

[Cite as *State v. Marshall,* 175 Ohio App.3d 488, 2008-Ohio-955.]

Court of Appeals of Ohio,
First District, Hamilton County.

Nos. C–060751, C–060752 and C–060753.

Decided March 7, 2008.

490

492

Joseph T. Deters, Hamilton County Prosecuting Attorney, and Paula E. Adams, Assistant Prosecuting Attorney, for appellee.

Cross, Smith & Associates Co., L.P.A., and Gloria Smith, for appellant.

CUNNINGHAM, Judge.

{¶ 1} Junis Sublett was shot by an occupant of a truck at the Pleasant Run Apartments in Springfield Township during the early evening of May 18, 2005.

The truck's driver then drove over Sublett's body. Police officers called to the scene found Sublett lying on the pavement near marijuana debris. Shortly after the shooting, the police officers interviewed witnesses, including Sublett's friend Randy Washington.

{¶ 2} Washington told the police that he had not seen the shooting but that he had been with Sublett moments before to carry out a plan that he, Sublett, and Sublett's neighbor at the Pleasant Run Apartments, Deangelo Tait, had made to rob Tait's drug dealer during a "drug deal" for two pounds of marijuana. According to the plan, Sublett was to grab the drugs from the dealer and then run to a getaway car where Washington would be waiting for him.

{¶ 3} Washington told the police that the dealer arrived in the parking lot of the apartment complex as a front-seat passenger in a green Dodge Durango. Washington stated that after Sublett had entered the Durango, Washington left to get the getaway car and heard two gunshots.

{¶ 4} Washington did not know the dealer's name, but he gave a description and showed the police where the dealer lived. He later viewed a photograph of defendant-appellant James Marshall and identified him as the dealer. Washington did not know the driver of the Durango, but he gave the police a description of him as well.

{¶ 5} After the police had discovered that Marshall's sister Sheila owned a Dodge Durango and that she also owned property and had children with a man named Jason Jones, the police obtained a photograph of Jones and placed it in a photographic lineup. Washington immediately identified Jones as the driver of the Durango.

{¶ 6} The police later learned that Marshall and Jones were staying in Lincolnton, North Carolina, under the names Antonio Allen and Will Jones. Eventually, Marshall was arrested and transported back to Cincinnati. Marshall admitted to being at the shooting but claimed that a man named DC was his driver and Sublett's shooter and that DC was Tait's cousin.

{¶ 7} Marshall, Jones, Tait, and Washington were charged with various offenses. Marshall was brought to trial and convicted of murder, involuntary manslaughter, drug trafficking, and drug possession, all with firearm specifications. He now appeals, raising eight assignments of error.

## The State's Witnesses

{¶ 8} A'Leha Williams, a 14–year–old resident of the Pleasant Run Apartments, testified that she had witnessed Sublett's shooting from the first-floor landing of her apartment building's outside staircase. According to Williams, Sublett was shot in the back of his head as he ran from the passenger side of a

"greenish-colored" truck that was approximately 30 to 40 feet in front of her. Williams said that after Sublett had fallen to the pavement, the driver sped off and the vehicle ran over Sublett. Importantly, Williams saw a gun's barrel pointed out the open front-passenger window. She heard two shots fired and saw the victim fall to the ground after the first shot was fired. Williams saw a front-seat passenger and a driver in the vehicle, but she could not identify either and did not see who had fired the shot that killed Sublett. While testifying, Williams was shown a photograph of Sheila Marshall's Durango, and she stated that the Durango looked like the vehicle involved in Sublett's death.

{¶ 9} Virginia Banks, also a resident of the apartment complex, testified that she had witnessed the shooting while descending the outside staircase from her third-floor apartment. She thought that she had heard five gunshots when she noticed the victim about two feet from a dark green vehicle. She recalled seeing the victim take a few steps, fall, get back up, and then fall again before he was run over by the dark green vehicle, which then sped out of the parking lot. While testifying, she was shown a photograph of Sheila Marshall's Durango, and she identified the Durango as the vehicle that she had seen run over Sublett.

{¶ 10} Washington's testimony at trial was consistent with his statements to the police. He testified that he, Sublett, and Tait had planned to rob Marshall, who had supplied Tait with marijuana in the past. In accordance with the plan, Tait had arranged for Marshall to sell Sublett and Washington two pounds of marijuana in the parking lot of the Pleasant Run Apartments.

{¶ 11} Washington waited with Sublett in the apartment complex's parking lot for Marshall's arrival. Washington was expecting Marshall to arrive alone and in a black Chevrolet Monte Carlo that he had previously seen parked in Marshall's driveway. Instead, Marshall arrived as a passenger in a green Durango that had been backed into a parking spot. Marshall called Sublett's cellular phone to let him know that he was in the vehicle.

{¶ 12} Washington and Sublett approached the vehicle together. Sublett entered the vehicle to get the drugs and sat in the back seat behind Marshall. Washington stood outside the vehicle on the driver's side until he noticed that the driver looked nervous and was reaching for the middle console, possibly to retrieve a gun. Washington then walked to the passenger side and saw two pounds of marijuana on Marshall's lap. Washington eventually went to a nearby breezeway to wait for Sublett's signal for him to get the getaway vehicle that was parked in a different parking lot. Sublett gave the signal, but as Washington proceeded to the getaway vehicle, he heard two gunshots and a vehicle speeding off. Washington returned to the parking lot where the drug transaction had taken place and saw Sublett lying on the pavement next to a white grocery bag

containing two bags of marijuana. Washington called an ambulance and then removed the marijuana, giving it to a neighbor.

{¶ 13} Washington claimed that the robbery plan did not call for the use of a gun. Rather, Sublett was to grab the marijuana and run. Washington also stated that he knew Sublett owned a gun but that he did not know that Sublett had his gun with him that day. On cross-examination, Washington admitted that after he had heard the gunshots, he thought Sublett might have had the gun with him.

{¶ 14} Washington confirmed his prior identification of Marshall and Jones, and he also identified Sheila Marshall's green Durango as the vehicle that Jones had been driving. Washington admitted to the jury that he had been indicted for his role in Sublett's murder and that he hoped to receive leniency because of his testimony against Marshall.

{¶ 15} Deangelo Tait testified that he had called Marshall around 2:45 p.m. on the day of the murder to set up a marijuana sale for himself, Randy Washington, and Junis Sublett. Tait claimed that Marshall was to sell two pounds to Washington and Sublett before meeting with him for the sale of half a pound. Additionally, he testified that he was not related to and did not know of anyone named DC.

{¶ 16} Tait admitted that he had prior felony convictions. Also, he explained that the state had initially charged him with murder relating to Sublett's death, but that the murder charges were dropped in exchange for his guilty plea to involuntary manslaughter. The court had imposed an agreed two-year term of imprisonment, but the plea bargain included the state's reservation of the discretion to seek a lesser sentence.

{¶ 17} Springfield Township Police Officer Daniel D. Carter testified that he had received a radio dispatch for shots fired at the apartment complex at 6:58 p.m. on the night of the murder. He and his partner, Nick Peterson, were the first officers to arrive at the scene. Carter observed Sublett's body on the pavement in the path of passenger-side rear-tire marks that ran in a northwest direction out of a parking spot. Paramedics took Sublett to the hospital, where he was pronounced dead.

{¶ 18} In the vicinity of Sublett's body, Carter noticed marijuana debris, a bloodied white plastic bag, a broken cellular phone, and blood. Additionally, Carter observed a bullet hole in the radiator of a vehicle parked diagonally from where the Durango had been parked. Carter observed that the bullet had traveled in a northwest direction. Carter used a diagram and photographs to demonstrate the crime scene upon his arrival.

{¶ 19} Kristin Carter, a nurse, testified that Sublett had arrived at the hospital fully clothed and that she had recovered a gun from Sublett's front pants pocket. Carter gave the fully loaded revolver to the police.

{¶ 20} Hamilton County Chief Deputy Coroner Gary Utz testified that Sublett had received a fatal gunshot wound to his skull. The bullet had entered the left side of Sublett's skull behind and above his left ear and exited from the skull in front of and above his right ear, likely rendering Sublett incapable of purposeful movement.

{¶ 21} Utz opined that Sublett was facing away from and was standing at least two feet from the gun when he was shot. Additionally, he testified that Sublett's wound could have been produced by a fully jacketed 9–mm Winchester bullet. Finally, Utz testified that Sublett had injuries indicating that he had been run over by a vehicle.

{¶ 22} Springfield Township Police Detective Patrick Kemper took Washington's statement on the night of the murder. He first testified that Washington had told him that one of the occupants of the vehicle had a semiautomatic weapon. Later, after reviewing his notes, Kemper testified that his notes indicated that Washington had told him only that the driver had been reaching towards the center console for something, possibly a gun.

{¶ 23} Kemper also relayed that he had had several short telephone conversations with Marshall before his arrest and that during these conversations Marshall had not mentioned the name DC.

{¶ 24} Kemper went to the crime scene several days after the shooting and looked for a spent casing and bullets. He found a spent 9–mm casing in the grass two inches from the parking lot, in an area where he would have expected to find a casing ejected from a semiautomatic weapon fired out the front passenger window of the vehicle. Kemper used measurements and photographs from the crime scene to create a diagram that depicted the location of the physical evidence, including Sublett's body, blood stains, tire marks, marijuana, the spent casing, and the parked vehicle that had been struck with a bullet.

{¶ 25} Springfield Township Police Detective James Ohl testified about the violence associated with drug dealing and his investigation of Sublett's murder. Ohl stated that photographs introduced by the state accurately depicted what he had seen when he arrived at the crime scene at 7:15 p.m. He told the jury that he had collected what resembled marijuana debris from the parking lot near Sublett's body and that it had been tested and determined to be 6.57 grams of marijuana.

{¶ 26} He further testified that Washington had provided the police with Marshall's address and that although Washington did not know Marshall's name,

he described him as a "white Mexican." From the address, the police obtained Marshall's name, and Washington identified Marshall from a photograph. The police looked for Marshall's name in a LexisNexis police database. This database returned the name of Sheila Marshall, Marshall's sister. And by entering Sheila Marshall's name into the database, Ohl obtained Jason Jones's name, because Jones and Sheila Marshall were in a relationship and owned property together, including a house in West Chester, Ohio. Ohl discovered that Sheila Marshall owned a green Dodge Durango, which was the vehicle described at the scene. But police driving by the West Chester residence observed only a black Monte Carlo in the driveway.

{¶ 27} Ohl further testified that on May 20, 2005, he had received word that Sheila Marshall had been stopped on Interstate 75 while driving the Durango. Ohl responded to this scene and inspected the interior of the vehicle. Ohl described the interior as newly cleaned and containing new pink seat covers, new floor mats, and new stickers. He had the vehicle towed to the Springdale Police station and tested for forensic evidence such as transfer of blood, skin, and clothing. The test results were inconclusive.

{¶ 28} Ohl received permission from Sheila Marshall to search the West Chester residence that she shared with Jones. Numerous documents addressed to and pertaining to Jones were found in the residence. Additionally, the search yielded 429 pounds of marijuana that had been compressed into bricks and stored in two freezers. The police also found guns and ammunition, as well as a magazine clip loaded with fully jacketed 9–mm Winchester bullets. The police did not locate the gun designed to use the magazine. But Ohl testified that the spent casing found in the grass at the Pleasant Run Apartments was similar in caliber to and bore the same head stamp as some of the ammunition found in the residence.

{¶ 29} Ohl was unable to locate Marshall and Jones after the shooting. In early June, Ohl contacted officers in Lincolnton, North Carolina, because Marshall's family members had been receiving frequent phone calls from the area. The calls had been made from a cellular phone registered to an Antonio Allen. Ohl sent the Lincolnton officers photographs of both Marshall and Jones, and he asked them to investigate an address that he had provided.

{¶ 30} After receiving word that Marshall had been apprehended in Lincolnton, Ohl traveled there to interview Marshall. According to Ohl, Marshall admitted to being the passenger in the vehicle involved in the shooting but claimed that Sublett had been robbing him at gunpoint and had ordered him to put his head between his knees. He also denied that Jones had been the driver and claimed not to know Jones very well. He implicated a man named DC as the shooter but did not provide a description of the man other than that he was "Deangelo's

cousin" and that he drove a green GMC Yukon or Chevrolet Suburban with a Tennessee license plate.

{¶ 31} Finally, the state offered the trial depositions of two Lincolnton police officers who had found Marshall hiding in the woods near the address Ohl had provided to them. The officers testified that Marshall had identified himself as Antonio Allen. The officers testified that they did not find Jones with Marshall when they apprehended him, but that one officer had encountered Jones, who was using the name Will Jones, at the designated address in North Carolina during an unrelated investigation.

### Marshall's Witnesses

{¶ 32} At trial, Marshall testified that when Sublett was shot, he was a passenger in a vehicle driven by a man named DC and that they were in the parking lot of the Pleasant Run Apartments to sell two pounds of marijuana to a man named Brandon. Marshall claimed that his friend Deangelo Tait had called him earlier in the day to set up the sale. Marshall was to receive $150 from the transaction, which included $50 that Tait had previously owed him.

{¶ 33} Marshall described DC's vehicle as a dark green Chevrolet Tahoe truck with a Tennessee license plate on the front. According to Marshall, after DC had parked the Tahoe, Marshall noticed Sublett and Washington, whom he did not know, standing nearby. Marshall tried to call Brandon, and either Sublett or Washington answered the call and asked whether Marshall was in the truck. When Marshall said yes, the men walked up to the truck. Marshall claimed that he sensed that they were about to be robbed and that he told DC to drive away. DC replied, "It's cool, I got this."

{¶ 34} Marshall asked Sublett and Washington why Brandon was not there and was told that he was in the house. Sublett and Washington then asked to see the marijuana because they were going to share the marijuana with Tait. DC told Sublett to get in the vehicle. Washington remained outside the vehicle. DC retrieved a bag of marijuana from underneath the driver's seat and handed it to Sublett, who was in the back seat. Washington then walked away from the vehicle to the breezeway of the apartment building.

{¶ 35} Sublett began negotiating a price, but then he pulled out a gun and indicated that he was robbing them. Marshall put his head between his legs after Sublett had ordered him to do so. Marshall heard DC tell Sublett to take the drugs and saw, after turning his head to the right, that DC had his hands up in the air. Then, according to Marshall, Sublett exited from the vehicle while indicating that he wanted to take Marshall's and DC's personal belongings. Marshall claimed that when he looked up again, he saw that Sublett was aiming a revolver, held in his right hand, at Marshall's head. Sublett was also holding the

bag of marijuana in one of his hands while he attempted to unlock the front passenger door through the open window. Marshall then heard two gunshots, and the vehicle sped away. He looked at DC and saw that he had a gun in his hand. Then he sensed that the vehicle had run over something while exiting from the parking lot.

{¶ 36} Marshall claimed that DC then pointed the gun at him and accused him of helping to plot the robbery. Marshall directed DC to the expressway, where they traveled south. After crossing the bridge into Kentucky, they came upon a traffic jam. Marshall said that he jumped out of the vehicle and walked to a nearby restaurant.

{¶ 37} Later, his friend Ryan Alexander met him, and they spent the night at Alexander's home. The next day, Alexander drove him to Louisville, where he met Jones at a hotel. While in Louisville, Alexander was involved in a car accident, and Jones drove Alexander to Cincinnati. Marshall remained in Louisville until Jones called him and told him to return to Cincinnati by bus. According to Marshall, Jones wanted Marshall to return because news agencies were naming Jones as a suspect in Sublett's murder. Jones met Marshall at the bus station, and they stayed at a friend's home that night. The next morning, they met with an attorney who advised them to surrender to the police. Marshall told the jury that they had decided against that because they did not know DC's identity. Therefore, they decided to go to North Carolina for a short time.

{¶ 38} Marshall told the jury that he had used the alias Antonio Allen while in North Carolina and explained that he had used this name, with the consent of the real Antonio Allen, for several months prior to Sublett's death to avoid prosecution for a probation violation. He also acknowledged that he had several felony convictions.

{¶ 39} Marshall confirmed that he had short phone conversations with Detective Kemper before his arrest and that he had given Kemper an account of the shooting. He reviewed Detective Kemper's summary of the conversation and claimed that Kemper had for the most part captured the "full conversation." But on cross-examination, he said that the summary omitted his mention of Brandon and DC and incorrectly indicated that he had told Kemper that Sublett had shot first.

{¶ 40} With regard to his post-arrest interview, Marshall said that he had told Detective Ohl about DC, but that Ohl had not asked him for a physical description of DC. Marshall conceded that he had never volunteered a description.

{¶ 41} Finally, on cross-examination, Marshall agreed with the state that a drug deal was a dangerous transaction.

{¶ 42} Ryan Alexander testified and confirmed that he had driven Marshall to Louisville, where they had met Jones, and that Jones had driven him back to Cincinnati because his own vehicle had been damaged in a car accident.

## Rebuttal

{¶ 43} The state called Detective Ohl to rebut Marshall's testimony that the green vehicle he had ridden in bore a front license plate from the state of Tennessee. Ohl testified that the state of Tennessee did not use front license plates.

{¶ 44} After the jury had found Marshall guilty on all counts, Marshall moved for a new trial on the basis that a previously unknown eyewitness, Yolanda Bailey, had come forward. The trial court overruled the motion after holding an evidentiary hearing at which Bailey testified. The court then sentenced Marshall to an aggregate term of 20½ years to life in prison.

## Weight and Sufficiency of the Evidence

{¶ 45} In his first three assignments of error, Marshall argues that his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence, and that the trial court erred in overruling his Crim.R. 29 motions for an acquittal. We address these assignments of error together.

{¶ 46} When reviewing the record for the sufficiency of the evidence, this court must view all the evidence presented in the light most favorable to the state and determine whether a rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt. The same standard is employed to determine whether a trial court properly overruled a Crim.R. 29 motion for an acquittal. But when reviewing the manifest weight of the evidence, this court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed." [1]

{¶ 47} Marshall was convicted of murder, in violation of R.C. 2903.02(A); involuntary manslaughter, in violation of R.C. 2903.04(A); drug trafficking, in violation of R.C. 2925.03(A)(1) and 2925.03(A)(2); and possession of marijuana, in violation of R.C. 2925.11(A). He was also convicted of a three-year firearm specification for the murder and a one-year firearm specification for each of the other offenses.

---

1. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541.

{¶ 48} Marshall first argues that the state did not present sufficient evidence to place the murder weapon in his hand. We disagree. A'leha Williams testified that she had seen the gun used to kill Sublett pointed out of the Durango's front passenger window. Washington testified that Marshall was the front-seat passenger. Marshall's testimony corroborated both of these facts. Thus, Marshall was there, and he was in a position to be the shooter. The state may use circumstantial evidence to prove its case,[2] and we hold that the evidence in this case, when viewed in the light most favorable to the state, was sufficient to support a finding that Marshall had shot Sublett.

{¶ 49} Next, Marshall argues that the state failed to prove that the killing was purposeful, as required for a murder conviction under R.C. 2903.02(A). But the state's evidence at trial demonstrated that Marshall had shot Sublett in the head as Sublett was moving away from the Durango with his fully loaded gun in his pocket. The coroner stated in his autopsy report and in his direct testimony that Sublett was at least two feet away from the gun when he was shot and that "the projectile traveled left to right, back to front, and upward." This evidence was sufficient for the jury to conclude that the killing was purposeful. Although the coroner misstated the direction of travel as "front to back" on cross-examination in response to a question concerning whether there was an upward swing to the bullet path, the bullet, which unequivocally entered behind Sublett's left ear and exited in front of and above Sublett's right ear, had to travel in a back-to-front direction.

{¶ 50} Marshall also specifically challenges the sufficiency of the state's evidence to support the involuntary-manslaughter conviction. To establish the offense of involuntary manslaughter, the state was required to establish that Marshall had caused Sublett's death as a proximate result of his commission of or attempt to commit the felony of trafficking in drugs. A portion of the jury instructions regarding proximate cause stated as follows:

{¶ 51} "A proximate result of an alleged criminal act is one that would not have occurred but for the act, and it was reasonably foreseeable as directly, naturally, and logically within the scope of the risk created by the act."

{¶ 52} Marshall argues that Sublett died as a proximate result of his own criminal behavior, and, thus, that Sublett did not die as the proximate result of Marshall's drug trafficking. He also argues that the state failed to prove that Sublett's death was reasonably foreseeable, because Marshall did not know that he was going to be robbed.

---

2. *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492.

{¶ 53} Marshall misinterprets the standard for proximate result, which, as used in the involuntary-manslaughter statute, is equivalent to proximate cause.[3] The proximate-cause element is satisfied when the accused sets in motion a sequence of events that makes the death of another a " 'direct, proximate, and reasonably inevitable consequence.' "[4] Only a reasonably unforeseeable intervening cause will absolve one of criminal liability in this context.[5]

{¶ 54} To establish proximate causation, the state presented evidence that the death of Sublett would not have occurred that evening if Marshall had not set up the drug transaction and that drug transactions were dangerous endeavors that could often lead to robbery or even deadly violence. Marshall's own testimony corroborated testimony from several state's witnesses on the dangers associated with drug transactions. We conclude that this evidence was sufficient to establish proximate cause.

{¶ 55} After reviewing all the evidence presented at trial, we hold that Marshall's convictions for murder, involuntary manslaughter, drug trafficking, drug possession, and the firearm specifications were supported by sufficient evidence.

{¶ 56} Marshall also claims that the greater weight of the evidence, including his own testimony, demonstrated that the driver was the shooter. We are not persuaded, as the evidence permitted a conclusion that would have excluded the driver as the shooter. The state argued that due to the location of Sublett and the Durango when Sublett was shot, the driver would have had to fire through the front windshield to strike Sublett, even if he were leaning over the passenger seat. Further, all the observed evidence, including the discovery of a spent casing outside the Durango and the quickness with which the driver "skirted" off after the shooting, supported the state's theory that the passenger, not the driver, was the shooter.

{¶ 57} With regard to all of Marshall's convictions, we note that the jury was able to personally view the demeanor of the witnesses and, therefore, was in the best position to judge their credibility. The jury was free to reject Marshall's testimony, as it was contradicted in many respects by the physical evidence and testimony from the state's witnesses. Marshall's credibility was further harmed by his contradictory prior statements and his flight after the crimes. Moreover, Marshall's prior felony convictions and his previous use of an alias to avoid

---

3. *State v. Robinson*, 1st Dist. No. C–060434, 2007-Ohio-2388, 2007 WL 1452590, at ¶ 25.

4. *State v. Lovelace* (1999), 137 Ohio App.3d 206, 215, 738 N.E.2d 418, quoting *State v. Chambers* (1977), 53 Ohio App.2d 266, 272–273, 7 O.O.3d 326, 373 N.E.2d 393.

5. Id. at 215–220, 738 N.E.2d 418.

prosecution for a probation violation were factors that the jury could have considered in determining whether he was telling the truth.

{¶ 58} We cannot say that the evidence weighed heavily against Marshall's convictions and that the jury lost its way in finding Marshall guilty of the offenses.

{¶ 59} Following our review of the record, we conclude that Marshall's convictions were supported by sufficient evidence, that the trial court did not err in overruling Marshall's motions for an acquittal, and that Marshall's convictions were not against the manifest weight of the evidence. Accordingly, the first, second, and third assignments of error are overruled.

## Evidentiary Issues

{¶ 60} Marshall raises evidentiary issues in his fourth assignment of error. First, he claims that the trial court allowed evidence of conforming conduct in violation of Evid.R. 404(B) when it permitted testimony that Marshall had used a false name prior to the shooting to avoid prosecution for a probation violation. But Marshall provided the jury with this information—during his direct examination. Marshall cannot now object to the trial court's admission of his own testimony.

{¶ 61} Next, Marshall argues that the trial court erred by allowing the state to present evidence of the discovery of marijuana in the West Chester residence that Jones shared with Sheila Marshall and the discovery of a spent casing at the scene five days after the crime. According to Marshall, this evidence was not relevant, or, alternatively, its relevancy was outweighed by its unfair prejudice. We cannot find merit in Marshall's argument.

{¶ 62} Marshall was tried as a principal or an accomplice for involuntary manslaughter with an underlying felony of trafficking in marijuana. He was coindicted for this offense with Jones. Testimony establishing that the police had found a huge quantity of marijuana packed in freezers in Jones's residence a few days after Sublett's murder was relevant and admissible to show that Marshall and Jones had trafficked in marijuana and were involved together in a drug transaction when Sublett was shot.[6] And this evidence decreased the probability that DC was the driver as alleged by Marshall, impugning Marshall's credibility. Similarly, the evidence established that Marshall had trafficked in marijuana and possessed marijuana, other drug offenses he was charged with.

{¶ 63} Testimony concerning the spent casing that the police found in the grass abutting the Pleasant Run Apartments was relevant to establish the

---

6. Evid.R. 401.

position of the gun when Sublett was shot. The evidence bolstered Williams's testimony that the gun was positioned outside the vehicle. The evidence also increased the probability that the murder weapon was a semiautomatic and that the ammunition had come from Jones's residence, where the police had found similar ammunition. The five-day interval in locating the casing did not render it irrelevant where there was no evidence of grass mowing or gunfire in the area during the interval.

{¶ 64} Finally, Marshall argues that any probative value of the drug and spent-casing evidence was substantially outweighed by unfair prejudice to him and, therefore, that the evidence should have been excluded under Evid.R. 403(A). But Marshall does not explain how this evidence unfairly prejudiced him, and we cannot discern any unfair prejudice to him due to this evidence. Where the evidence was clearly probative, we find no merit to his contention. Accordingly, we overrule the fourth assignment of error.

### Alleged Prosecutorial Misconduct

{¶ 65} In his fifth assignment of error, Marshall argues that his due-process rights were violated by prosecutorial misconduct three times during the trial. First, Marshall claims that the prosecutor improperly stated in closing argument that Marshall had "acted in conformity with his prior convictions." But Marshall cites the prosecutor's argument to the jurors that in determining whether to believe Marshall's or Washington's identification of the driver, they should consider that Marshall used a false name in the past to subvert justice. Although Marshall characterizes it otherwise, this comment by the prosecutor did not maintain that Marshall had acted in conformity with his prior convictions. Rather the prosecutor's comment, which was based upon Marshall's own testimony that he had used an alias prior to the shooting to avoid prosecution for a probation violation, was proper commentary on Marshall's character for truthfulness.[7]

{¶ 66} Next, Marshall claims that the prosecutor knowingly presented false evidence at trial when Washington testified that he did not know whether Sublett had a gun. According to Marshall, Washington had previously told the grand jury that Sublett had a gun.

{¶ 67} As noted by the state, the grand-jury transcript is not a part of the record, a deficiency that prevents this court from substantiating Marshall's claim about what Washington had told the grand jury. Moreover, our review of Washington's trial testimony, including his cross-examination, demonstrates that

---

7. See Evid.R. 608(B).

Washington told the jury at trial that he knew Sublett owned a gun but that he did not know whether Sublett had brought it to the robbery. He even conceded that when he heard the gunshots, he considered that Sublett might have brought his gun and fired the shots. Thus, Marshall's attorney thoroughly cross-examined Washington and effectively impeached him on the issue raised. Finally, Marshall has not cited any authority to support his assertion that inconsistent testimony by a witness demonstrates that a prosecutor has presented false evidence.

{¶ 68} Marshall also claims, citing *Brady v. Maryland*,[8] that the prosecutor committed misconduct by failing to disclose Yolanda Bailey as a witness pursuant to Marshall's discovery request. In *Brady*, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."[9] Favorable evidence under *Brady* encompasses both exculpatory and impeachment evidence, and the evidence must be both favorable and material before disclosure is required.[10]

{¶ 69} Bailey unequivocally testified at the hearing on the motion for a new trial that she had told the police that she did not see the shooting. Where this statement was not material and favorable to Marshall, the state did not violate *Brady* by not disclosing it.

{¶ 70} We find no merit to Marshall's claim of prosecutorial misconduct. Accordingly, we overrule the fifth assignment of error.

## Motion for a New Trial

{¶ 71} In his sixth assignment of error, Marshall claims that the trial court erred when it denied his motion for a new trial based upon newly discovered evidence.

{¶ 72} To warrant the granting of a new trial based on newly discovered evidence in a criminal case, it must be shown that the new evidence "(1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not

---

8. (1963), 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215.

9. Id. at 87, 83 S.Ct. 1194, 10 L.Ed.2d 215.

10. *United States v. Bagley* (1985), 473 U.S. 667, 674, 105 S.Ct. 3375, 87 L.Ed.2d 481.

merely impeach or contradict the former evidence." [11] The decision whether to grant a new trial on the ground of newly discovered evidence falls squarely within the discretion of the trial court.[12]

{¶ 73} At the hearing on the motion for a new trial, Marshall presented an affidavit and testimony from Yolanda Bailey. Bailey lived next to Tait in the apartment complex. She claimed that she had seen the driver of the green truck shoot Sublett, despite having told the police on the night of the shooting that she had not seen the shooting.

{¶ 74} At the hearing, Bailey explained that when she heard the first shot, she went to her window and saw the green truck. The truck started to pull out of the parking spot, and then "the man fell out of the back seat and then his clothes was off before he got out of the car. Then the driver reached over and fired a gun. Then they rolled over him then they had left out." Bailey claimed that she had initially refused to come forward because she was scared.

{¶ 75} In ruling on the motion, the trial court indicated that after observing and carefully listening to Bailey, and comparing what she had said to the testimony at trial, Bailey's testimony would not have yielded a different result in a new trial. We cannot say that the trial court's decision was an abuse of discretion.

### Sentencing Issues

{¶ 76} In his seventh assignment of error, Marshall argues that the trial court imposed a sentence that was contrary to law. The court imposed a prison term of 15 years to life for murder in addition to a three-year term for an accompanying firearm specification; ten years for involuntary manslaughter with an additional one-year term for a firearm specification; 18 months for each count of trafficking in marijuana with an additional one-year term for a firearm specification; and 12 months for possession of marijuana with an additional one-year term for a firearm specification. The court ordered several of the terms, including the terms for the firearm specifications, to be served consecutively, for an aggregate minimum term of 20½ years in prison.

{¶ 77} Marshall argues that the court erred in sentencing him for both murder and involuntary manslaughter because, according to Marshall, involuntary manslaughter is a lesser-included offense of murder. "Murder" is defined in R.C. 2903.02(A) as purposely causing the death of another. "Involuntary manslaughter" is defined in R.C. 2903.04 as causing the death of another as the

---

11. *State v. Petro* (1947), 148 Ohio St. 505, 36 O.O. 165, 76 N.E.2d 370, syllabus.

12. *State v. Hawkins* (1993), 66 Ohio St.3d 339, 350, 612 N.E.2d 1227.

"proximate result of the offender's committing or attempting to commit" a felony or a misdemeanor.

{¶ 78} An offense may be a lesser-included offense of another only if (1) the offense carries a lesser penalty than the other; (2) the offense of the greater degree cannot, as statutorily defined, ever be committed without the offense of the lesser degree also being committed; and (3) some element of the greater offense is not required to prove the commission of the lesser offense.[13]

{¶ 79} "[T]he evidence presented in a particular case is irrelevant to the determination of whether an offense, as statutorily defined, is necessarily included in a greater offense."[14]   Under this test, "[i]nvoluntary manslaughter is always and necessarily a lesser included offense of murder because murder cannot ever be committed without also committing or attempting to commit a felony or a misdemeanor."[15]

{¶ 80} Thus, the trial court erred in separately convicting Marshall on the lesser-included offense of involuntary manslaughter.   We reverse Marshall's involuntary-manslaughter conviction, but Marshall's aggregate sentence is unaffected because the trial court made the involuntary-manslaughter sentence concurrent with the murder sentence of 15 years to life in prison.

{¶ 81} The court also separately sentenced Marshall for allied offenses of similar import.   In State v. Cabrales, this court determined that possession of drugs in violation of R.C. 2925.11(A) and trafficking in the same drugs in violation of R.C. 2925.03(A)(2) were allied offenses of similar import.[16]   Consequently, the trial court could have convicted Marshall of only one of these offenses.   Instead, the trial court convicted him of both and imposed consecutive terms of incarceration.

{¶ 82} We sua sponte set aside the multiple sentences imposed for the allied offenses and remand this case for the trial court to impose sentence on either possession of marijuana in violation of R.C. 2925.11(A) or trafficking in marijuana in violation of R.C. 2925.03(A)(2).   But our reversal of the sentences is stayed pending the outcome of the Ohio Supreme Court's decision in Cabrales.

---

13.   State v. Deem (1988), 40 Ohio St.3d 205, 533 N.E.2d 294, paragraph three of the syllabus.

14.   State v. Kidder (1987), 32 Ohio St.3d 279, 282, 513 N.E.2d 311.

15.   Id.;  see also State v. Lynch, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185.

16.   State v. Cabrales, 1st Dist. No. C–050682, 2007-Ohio-857, 2007 WL 624995, discretionary appeal accepted, 114 Ohio St.3d 1410, 2007-Ohio-2632, 867 N.E.2d 844.

{¶ 83} Next, Marshall argues that his sentence was excessive. Following the Ohio Supreme Court's decision in *State v. Foster*, a trial court has full discretion to impose a sentence that is within the available statutory range, and the court no longer needs to make findings or provide reasons in support of such a sentence.[17] In this case, the trial court imposed terms that were within the available statutory ranges for the offenses. Accordingly, we conclude that the sentence imposed was not excessive.

### Ineffective Assistance of Trial Counsel

{¶ 84} In his final assignment of error, Marshall argues that he was denied the effective assistance of trial counsel. To prevail on such a claim, Marshall must prove that trial counsel violated an essential duty and that he was prejudiced by that violation.[18] A reviewing court will strongly presume that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.[19]

{¶ 85} Marshall specifies four instances where counsel allegedly violated an essential duty: counsel's failure to raise the affirmative defenses of self-defense and defense of others; counsel's failure to remove a juror who was a neighbor and a friend of a high-ranking prosecutor in Hamilton County; counsel's failure to argue that Sublett had an additional gun that Washington had removed from the scene; and counsel's failure to locate Yolanda Bailey as an eyewitness prior to trial.

{¶ 86} First, we hold that counsel engaged in sound trial strategy by not raising self-defense or defense of others to justify Marshall's shooting of Sublett. These defenses conflicted with the complete defense Marshall presented—that he was not the shooter.

{¶ 87} Second, counsel's failure to remove a juror who lived next to a chief assistant prosecutor does not support Marshall's claim. The juror's neighbor was not involved in the trial, and the juror unequivocally stated that he could be impartial.

{¶ 88} Third, counsel's failure to argue that Sublett had two guns with him, one in his pocket and one in his hand, did not constitute ineffective

---

17. *State v. Foster*, 109 Ohio St.3d 1, 2006–Ohio–856, 845 N.E.2d 470, paragraph seven of the syllabus.

18. *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373; *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674.

19. Id.

assistance. Because Marshall's defense was that he was not the shooter, the number of weapons possessed by the victim was immaterial.

{¶ 89} Finally, Marshall has failed to show that trial counsel's failure to locate Bailey amounted to a breach of a duty that prejudiced him. Bailey purposely avoided involvement in this case and told the police that she had not witnessed the shooting. And the trial court, in ruling on Marshall's motion for a new trial, determined that if Bailey had testified at trial, it was unlikely that the result would have been different.

{¶ 90} Marshall has failed to show that counsel violated an essential duty that prejudiced him. Accordingly, we overrule the eighth assignment of error.

## Conclusion

{¶ 91} Because, in specified instances, separate convictions were prohibited by law, we reverse Marshall's conviction for involuntary manslaughter, and we vacate the separate sentences for trafficking in marijuana in violation of R.C. 2925.03(A)(2) and possession of marijuana in violation of R.C. 2925.11(A). This cause is remanded, subject to our stay order, for the trial court to impose one sentence on either the R.C. 2925.03(A)(2) offense or the R.C. 2925.11(A) offense. In all other respects, we affirm the trial court's judgment.

Judgment accordingly
and partial stay issued.

HILDEBRANDT, P.J., and SUNDERMANN, J., concur.