[Cite as *State v. Hayes*, 2014-Ohio-254.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SENECA COUNTY

STATE OF OHIO,

           CASE NO. 13-13-21

      PLAINTIFF-APPELLEE,

      v.

JAMES A. HAYES III,               O P I N I O N

      DEFENDANT-APPELLANT.

Appeal from Seneca County Common Pleas Court
Trial Court No. 12-CR-0165

**Judgment Affirmed**

Date of Decision: January 27, 2014

APPEARANCES:

    *Scott B. Johnson* for Appellant

    *Angela M. Boes* for Appellee

**WILLAMOWSKI, P.J.**

{¶1} Defendant-appellant James A. Hayes, III ("Hayes") brings this appeal from the judgment of the Court of Common Pleas of Seneca County finding him guilty of two counts of felonious assault and sentencing him to a total prison term of seven years. Hayes challenges the judgment claiming that his conviction was against the manifest weight of the evidence and that he was denied effective assistance of counsel. For the reasons set forth below, the judgment is affirmed.

{¶2} On September 12, 2012, the Seneca County Grand Jury indicted Hayes on two counts. Doc. 1. Both counts alleged that Hayes had committed felonious assault in violation of R.C. 2903.11(A)(2),(D)(1)(a), felonies of the second degree. *Id.* On September 19, 2012, Hayes entered a plea of not guilty to both counts. Doc. 14.

{¶3} Between February 25 and February 28, 2013, a jury trial was held. Doc. 41. At trial, the State presented the testimony of seventeen witnesses and Hayes presented the testimony of two witnesses. The first witness for the State was Ohio State Trooper Anthony Scherley ("Scherley"). Tr. 156. Scherley testified that on February 19, 2012, he stopped a white minivan after it pulled out in front of him from a private drive. Tr. 157-58. When he approached the driver, he observed blood on the driver as well as on the van. Tr. 158. Scherley then

called for an ambulance. Tr. 159. The driver was Brian Armbruster ("Armbruster") and there was a passenger in the vehicle who was identified as Roger Seifert ("Seifert"). Tr. 159. Scherley learned that Armbruster and Seifert had earlier been in a fight at a bar and that Armbruster had been stabbed during it. Tr. 159. The investigation was turned over to the Tiffin Police Department and Armbruster was transported from the scene by ambulance. Tr. 159-60.

{¶4} The next witness for the State was Tiffin Police Officer Brent Riley ("Riley"). Tr. 163. Riley testified that he was sent to Stiney's Three Oaks Bar ("Three Oaks") in Tiffin, Seneca County, Ohio, to investigate a stabbing. Tr. 165. He was sent to check the parking lot for signs of evidence and he located some blood droplets. Tr. 165. A second officer at the scene found a small knife in the grass near the parking lot. Tr. 166. Later in that shift, he was sent to investigate a car crash in which he was informed the suspect for the stabbing might have been involved. Tr. 166. At the scene, Riley observed blood on the red car and saw a red t-shirt inside the car with blood on it. Tr. 167. The passenger in the red car was Hayes. Tr. 167. The driver of the vehicle was Staci Hayes ("Staci"), Hayes' wife. Tr. 167. While at the scene, Riley overheard Hayes tell the EMT's that he had been injured in a fight at a bar and that he wished to go to the hospital. Tr. 168. Hayes was then transported by the ambulance to the hospital. Tr. 168. The

damaged vehicle was then towed to the Parks Department and placed in a secured garage. Tr. 169. Armbruster's minivan was also there. Tr. 169.

{¶5} Seneca County Sheriff's Deputy Matthew Huffman ("Huffman") testified next for the State. Tr. 172. Huffman testified that he responded to an accident call between a red Pontiac Grand Prix and a bronze Ford Focus. Tr. 174. From the statements at the scene and the physical evidence, it appeared that Staci had been driving. Tr. 174. As Huffman approached the vehicle, he saw blood on Hayes and Staci. Tr. 175. Both Staci and Hayes stated that the blood was from injuries received when Hayes "got jumped in a bar fight." Tr. 176. Inside the vehicle, Huffman saw a white t-shirt with blood on it.[1] Tr. 176. Knowing of the stabbing at the Three Oaks earlier, Huffman questioned whether it was related. Tr. 176. Huffman then contacted the Tiffin Police Department. Tr. 177. Huffman then turned over the investigation to Riley and Lietenant Michelle Craig ("Craig"), while Huffman completed the accident report. Tr. 177.

{¶6} The fourth witness for the State was Detective Shawn Vallery ("Vallery") of the Tiffin Police Department. Tr. 183-84. Vallery was the on-call detective assigned to investigate the stabbing at Three Oaks. Tr. 185. He learned that the victim was Armbruster. Tr. 185. Upon learning that Armbruster was being taken to the emergency room, Vallery went there to speak with him. Tr.

---

[1] This testimony contradicts Riley's testimony that there was a red t-shirt with blood on it in the car. The color of the t-shirt was not resolved, but was not relevant.

At the hospital, Vallery observed scrapes to Armbruster's knees, a mark on his left cheek and forehead, and blood on a bandage on the left side of his torso. Tr. 186. After taking photographs of the injuries, Vallery collected Armbruster's clothing. Tr. 186. While at the hospital, Vallery learned about the accident and that Staci and Hayes were coming into the hospital where Vallery was located. Tr. 189. Craig collected the clothing from Staci and Hayes. Tr. 189. Vallery then identified the photographs of the clothing. Tr. 190-93. Specifically, Vallery identified Exhibits 11 and 12 as photographs of a jacket recovered from Seifert. Tr. 191. Exhibit 11 shows that there is a defect in the jacket.

{¶7} After leaving the hospital, Vallery went to Three Oaks to retrieve a copy of the video recording. Tr. 194. Upon arriving back at the police station, Vallery learned that Hayes was in critical condition and was having emergency surgery. Tr. 194. Vallery later interviewed various occupants of the bar, the bartender, and Seifert. Tr. 195. He also requested a warrant to search the vehicle. Tr. 195. Some of the evidence was sent to BCII for testing. Tr. 195. Vallery was able to identify the knife found at the scene, and testified that it had been sent to BCII for testing. Tr. 196-97. Vallery also testified that the jacket worn by Seifert on the night in question was Exihibit 38 and that he submitted it to BCII. Tr. 201.

{¶8} On cross-examination, Vallery testified that he did not speak to Seifert until the next day. Tr. 205. When Seifert came to the station, he was not tested

for alcohol consumption. Tr. 206. Vallery testified that he saw no need to test Seifert as he assumed that he had been drinking the night before since he was at the bar. Tr. 207. Vallery questioned Seifert because he was unsure who had started the fight. Tr. 207. Vallery admitted that during his investigation, he heard various stories and some statements were contradictory. Tr. 208. One of the people he questioned mentioned there was a gun, but no gun was found. Tr. 208-09. Vallery also admitted that he used to work for Armbruster for a couple of years and that he knew him "pretty well." Tr. 210-11. Armbruster does like to drink and is not afraid to speak his mind. Tr. 211. When questioned by Vallery, Armbruster stated that he had been drinking. Tr. 211. At the initial questioning of Armbruster, Vallery noticed there was blood on the shirt and jeans that Armbruster was wearing. Tr. 213. Armbruster also identified a camouflage shirt,[2] which was found in Hayes' vehicle, as a shirt he was wearing that night. Tr. 214. When speaking with Armbruster at the emergency room, Vallery noticed that Armbruster was in pain and that he had been drinking. Tr. 216.

{¶9} The next witness for the State was Detective Charles Boyer ("Boyer") of the Tiffin Police Department. Tr. 217. Boyer testified that after delegating evidence collecting duties, he went to Three Oaks to process the scene. Tr. 220. When he arrived at Three Oaks, the scene was already taped off. Tr. 220. Boyer

---

[2] More than one shirt was found in Hayes' vehicle.

reviewed the scene in the taped off area and also checked the area outside of the tape to insure that nothing was missed. Tr. 220-21. Inside the taped off area, Boyer found two hats, an open-blade knife, a Pepsi, a $10 bill, and blood splatter in seven different locations. Tr. 221. Boyer then photographed the entire area, including around the bar. Tr. 221. Boyer identified Exhibits 43 through 58 as the photos he took at Three Oaks. Tr. 222-25. The next day, Boyer assisted Vallery in procuring search warrants for the vehicles which were secured. Tr. 229. Once the warrants were obtained, Boyer participated in searching the two vehicles. Tr. 229. Boyer identified Exhibits 59-67 as photographs taken of the vehicles on February 20, 2012, pursuant to the search warrant. Tr. 229-32.

{¶10} The sixth witness for the state was Sergeant Robert Bour ("Bour") of the Tiffin Police Department.[3] Tr. 238. Bour testified that he was called in from home to help investigate the stabbing at Three Oaks. Tr. 240. When he arrived at Three Oaks, he was updated as to the status of the victim and his injuries, how the victim came to be known and that the alleged suspect's vehicle had been in a crash resulting in the suspect and his wife being transported to the emergency room. Tr. 240-41. Bour then went to the scene of the traffic stop of the victim. Tr. 241. When he arrived, he inspected the vehicle and "saw lots of blood." Tr. 241. There was blood under the driver's seat, on the steering wheel, and on the outer door

_____

[3] At the time of the investigation, Bour was a detective, but was promoted to sergeant prior to trial.

handle. Tr. 241. There also appeared to be fresh damage to the right front of the vehicle. Tr. 241. Bout identified Exhibits 70 and 71 as photos he took at the scene. Tr. 241. Once he had taken the photographs, Bour arranged to have the vehicle towed to the Parks Department and secured. Tr. 242. Bour then returned to Three Oaks to assist Boyer. Tr. 242. The next day, Bour assisted Boyer in searching the vehicles. Tr. 242-43. Out of the red vehicle, they collected a long sleeve, torn, bloody camouflage shirt. Tr. 243. On cross-examination, Bour testified that Armbruster was traveling away from the hospital when he was stopped. Tr. 249. Bour also admitted that he interviewed others who had been in the bar, but not until several days if not weeks had passed. Tr. 252.

{¶11} Next, Carrie Robenalt ("Robenalt") testified for the State. Tr. 261. Robenalt was the bartender at Three Oaks on February 19, 2012. Tr. 263. She is familiar with Armbruster and testified that he was in the bar that evening seated near the back door. Tr. 263. Seifert was also there and was standing near Armbruster. Tr. 263-64. Robenalt testified that neither Armbruster nor Seifert were involved with any arguments or confrontations with anyone. Tr. 264. She testified that a man and a woman got into an argument near the bathrooms that night because she was engaging in conduct he did not like. Tr. 264. At the time, she did not know who they were, but later learned that the man was Hayes and the woman was Staci. Tr. 265. Robenalt testified that Hayes was dressed all in black

and that Staci was wearing a white shirt. Tr. 265. When they left the bar, they were arguing. Tr. 265. Both Hayes and Staci were very intoxicated. Tr. 266. Although she did not know what they were saying she could tell they were arguing. Tr. 266. They left out the back door. Tr. 267. Armbruster and Seifert were still in the bar when Hayes and Staci left, and did not leave for at least a half hour. Tr. 267. Later, Hayes and Staci came back inside with blood all over them and Staci was upset. Tr. 267. Hayes had his right hand wrapped in a rag with blood dripping from it. Tr. 267. When people started asking questions, Hayes grabbed Staci's hand and told her they had to leave. Tr. 268. Hayes then dragged Staci down the hall and they left through the back door. Tr. 268. Other patrons followed them out. Tr. 268. Soon after that, the police arrived. Tr. 268.

{¶12} On cross-examination, Robenalt testified that earlier in the evening Seifert and another customer got into an argument and she threw out the other customer.[4] Tr. 287. She admitted that she had told Vallery that Seifert was angry and wanted to fight with the other customer, however it was normal for the other customer to cause problems. Tr. 289. She testified that on the night of the incident, Three Oaks was very busy and it was standing room only. Tr. 290-91. There was karaoke occurring in the bar that night and it was loud. Tr. 291. That night, she was working at the bar and did not leave her station. Tr. 291. Robenalt

---

[4] Robenalt testified that the other customer is a regular who usually gets thrown out every weekend for arguing with people. Tr. 287.

was frustrated that night because they were very busy and the only other person working was a trainee. Tr. 292. Up until the argument between Hayes and Staci, they did not cause any disturbance. Tr. 292-93. Robenalt testified that Armbruster and Seifert were drunk, but were not "trashed." Tr. 293-94.

{¶13} On re-direct examination, Robenalt testified that Hayes and Staci had also been drinking. Tr. 297. She testified that Staci was "really drunk" and was bouncing off walls and bumping into people. Tr. 297. Hayes was also drunk as she was serving him "double 77's." Tr. 298. On recross-examination, Robenalt testified that she served Armbruster and Seifert Bud Light. Tr. 298.

{¶14} The next witness for the State was one of the victims, Armbruster. Tr. 299. Armbruster testified that he and Seifert went from a gun raffle to a friend's home and then to Three Oaks. Tr. 300. Armbruster testified that he drove his minivan. Tr. 300. He parked the van in the back lot, locked the vehicle, and entered the bar through the back entrance. Tr. 301. Armbruster testified that he and Seifert sat down at the end of the bar, but he knew some of the other people who were there. Tr. 301. He did not have any arguments or fights with anyone inside the bar that night. Tr. 302. When he and Seifert got up to leave, it was not closing time yet. Tr. 303. They walked out the back door with the intention of getting the rest of the beer out of the van and walking to Seifert's home. Tr. 303. Armbruster testified that as they were walking to the car, they saw Hayes pushing

-10-

a woman around and they were screaming at each other. Tr. 304. Armbruster continued to the van and when he reached it, he turned around to see Seifert and Hayes arguing, but not fighting yet. Tr. 305. Armbruster then approached to try and break it up, and "a girl" jumped on his back. Tr. 305. Armbruster then tried to get her off the back. Tr. 306. At that time, Seifert and Hayes were fighting as well. Tr. 306. After getting the girl off his back, he again went toward Seifert and Hayes to try and break up the fight, and the girl jumped on his back again. Tr. 306. He again knocked her off of his back and went towards the fighting duo. Tr. 307. When he got there, he felt a stabbing and the rush of blood coming out of him. Tr. 307. Armbruster did not see the knife. Tr. 307. Armbruster then went back to the van, unlocked it, and got in. Tr. 308. As he started it, Seifert got into the passenger side, and Armbruster put the van into gear and attempted to exit. Tr. 308. Hayes then started pounding on the windows and kicking the van until he dented it. Tr. 308. Armbruster was just trying to get away, so he pulled out of the parking lot and turned right. Tr. 309. Within a quarter of a mile, the police had stopped him, and approached the van. Tr. 309. When the officer shined the flashlight into the van, he showed him that he was covered in blood. Tr. 309. The night of the incident, Armbruster was wearing a camouflage hat, a camouflage shirt, a t-shirt, blue jeans, and tennis shoes. Tr. 310. During the scuffle with the woman, he lost his hat and his camouflage shirt. Tr. 310.

{¶15} The next thing Armbruster remembers was waking up on life support in Toledo. Tr. 309. Armbruster testified that he was on life support for two days and in the Intensive Care Unit for seven to ten days. Tr. 310. As a result of the stabbing, he had lost 65% of his blood and had to have transfusions. Tr. 310-11. In addition, his left lung collapsed and the doctors had to perform major surgery to relieve the pressure from the internal bleeding. Tr. 311. Armbruster testified that he was stabbed one time in his left side. Tr. 311. His lung will never "come back" and he has had to have reconstructive surgery to fix a problem with his stomach. Tr. 311. A year after the incident, Armbruster still was having problems due to the stabbing. Tr. 311-12. Armbruster did not know who his attacker was and had not spoken with him previously. Tr. 312.

{¶16} On cross-examination, Armbruster testified that he had three cans of beer to drink at the gun raffle. Tr. 312. At Three Oaks, Armbruster drank two more beers. Tr. 313. He might have had a single beer in the car between leaving the raffle and going to the bar. Tr. 313. His blood alcohol level was above the legal limit. Tr. 314. Armbruster testified that although he did not know who had stabbed him, there were only three people there and he knew it was not Seifert. Tr. 315. On redirect examination, Armbruster identified Exhibit 26, the camouflage shirt found in Hayes' vehicle, as the shirt he was wearing the night he was stabbed. Tr. 320.

{¶17} The ninth witness for the State was the second victim, Seifert. Tr. 323. Seifert testified that he, Armbruster, and another friend went to Bettsville around 6:00 p.m. on February 18, 2012. Tr. 324. When they left, they took the friend home and then he and Armbruster went to Three Oaks. Tr. 324. Armbruster was driving. Tr. 324. Armbruster then parked at the back of the lot and they entered the bar through the rear entrance. Tr. 325. Seifert denied that either he or Armbruster argued or fought with anyone inside the bar that night. Tr. 325. When they left the bar, they went out the back door and he heard a man and woman arguing. Tr. 327. Seifert testified that he told the man to "leave her alone" and the man charged him. Tr. 327. He knew the man was Hayes because he had gone to school with him. Tr. 327. Hayes pushed him and they ended up "wrestling around on the ground." Tr. 328. Armbruster was approximately ten feet away and the girl was on his back. Tr. 328. The fight ended when Seifert, who was on top of Hayes, let Hayes up. Tr. 328. When they stood up, he saw Hayes pull something shiny out of his pocket and stab Armbruster with it. Tr. 328-29. Armbruster was stabbed on his left side. Tr. 329. Seifert did not recall what happened between the stabbing and trying to get into the van. Tr. 329. Seifert remembered that once they were in the van, Hayes began hitting it and kicking at it while trying to get in. Tr. 329-30. They then pulled out of the parking lot to get away but Seifert did not know where they were headed. Tr. 330.

Almost immediately upon leaving the parking lot, they were pulled over. Tr. 330. Once stopped, the patrolman came up with his flashlight and Seifert saw all the blood. Tr. 330. Armbruster was quickly transported by ambulance. Tr. 331. A friend of Seifert's came to get him. Tr. 331.

{¶18} On cross-examination Seifert testified that he only lived two blocks away from Three Oaks. Tr. 332. The police would not let him leave the scene to walk home, but insisted that someone come and get him. Tr. 332-33. Seifert admitted that he drank "approximately a 12 pack" that night. Tr. 333. Seifert testified that he gave a statement to the officers at the traffic stop. Tr. 334. However, he was unable to testify to how long he was at the stop or any other details concerning the stabbing. Tr. 334. Bour came to Seifert's home the next day to collect the clothing that Seifert had been wearing the previous night. Tr. 336. Seifert also testified that during the fight with Hayes, they were both on the ground, Seifert on top, and he was hitting the top of Hayes' head. Tr. 338. On redirect, Seifert testified that Hayes pulled the knife out and stabbed Armbruster after the fight was over. Tr. 341-42.

{¶19} For their tenth witness, the State called Melissa Lovas ("Lovas"). Tr. 343. Lovas testified that she had known Hayes for a couple of years. Tr. 344. She testified that at the time of the incident, she was at Three Oaks. Tr. 345. She did not notice any fights or arguments inside the bar that evening. Tr. 345. She

saw Hayes and Staci sitting at a table in the back with another couple. Tr. 346. At some point in time, she saw Staci come in the back door with her hands bleeding and wrapped in a shirt. Tr. 347. A couple seconds later, Hayes came in asking for help. Tr. 347. Lovas went outside with Staci and Hayes went to get the car. Tr. 347. When Staci got into the car, Hayes got out of it and started punching a white van. Tr. 347. Hayes then looked at Staci and "told her to grab the gun." Tr. 348. Lovas then went back into the bar. Tr. 348. Lovas admitted on cross-examination that she did not see a gun and did not hear any gun shots. Tr. 35. As she was getting ready to leave, the police arrived. Tr. 350.

{¶20} The next witness for the State was Cory Hess ("Hess"). Tr. 355. Hess was a customer at the Three Oaks the night of the incident. Tr. 357. Hess is an acquaintance of Armbruster and testified that Armbruster was wearing a camouflage shirt and a ball cap that night. Tr. 357. Hess is also an acquaintance of Seifert. Tr. 358. The night of the incident he saw a man and woman arguing. Tr. 358. Hess did not know them, but the man was dressed all in black, except for white tennis shoes. Tr. 358-59. The woman appeared to be very intoxicated, but the man appeared to be "like a normal person". Tr. 359.

{¶21} Vernon Hites ("Hites") was the twelfth witness for the State. Tr. 361. Hites testified that he got to Three Oaks at around 2:00 a.m. the night of the incident. Tr. 362. He and his friends entered through the front door. Tr. 363. As

-15-

he was the designated driver, he was only drinking soda.  Tr. 363.  Hites testified that he did not see any fights that evening, but as a result of a conversation about a fight, he went looking for his son in the back hall.  Tr. 263-64.  He then went out the back door into the parking lot where he saw a man arguing with a woman, and pushing her towards a red Grand Prix.  Tr. 364.  The man was screaming at the woman to get in the car.  Tr. 364.  Hites then returned to the bar and soon afterwards, the police arrived.  Tr. 365.  On cross-examination, Hites testified that he knows Armbruster, but did not see him in the bar.  Tr. 368.  Hites did not know Seifert or Hayes.  Tr. 368.

{¶22} The next witness was Mark Lang ("Lang"), who was a customer at Three Oaks on the night of the incident.  Tr. 369-70.  Lang testified that he knows Armbruster and he knows Hayes.  Tr. 370-71.  When he left around midnight, both Hayes and Armbruster were both still there.  Tr. 371.  On February 19, 2012, Lang opened the bar at 6:30 a.m. as the bartender.  Tr. 372.  Hayes came in between 7:00 and 8:00 a.m.  Tr. 372.  Lang testified that Hayes stated that he hoped Armbruster was "hurt bad and in pain after the three guys jumped me last night."  Tr. 373.  Lang then told Hayes to leave.  Tr. 373.

{¶23} For its fourteenth witness, the State presented Lieutenant Michelle Craig ("Craig") of the Tiffin Police Department.  Tr. 376.  Craig testified that she went to the crash site where Hayes and Staci were.  Tr. 379.   When she arrived,

the ambulance with Staci was leaving, but Hayes was still at the scene.  Tr. 379.

Hayes was dressed all in in black.  Tr. 380.  Hayes had a bloody nose and said he

was sore, so he was transported to the hospital as well.  Tr. 380.  At the scene, she

observed a cloth that appeared to be bloody behind the driver's seat of Hayes' car.

Tr. 380.  Craig identified Exhibit 75 as a photograph of the bloody cloth taken

through the window.  Tr. 381.

{¶24} After the scene of the crash, Craig went to the hospital.  Tr. 382.  At

the hospital, Craig spoke with Hayes.  Tr. 382.  Craig testified that she has known

Hayes for a long time and that he was intoxicated.  Tr. 382.  Craig observed some

small pin-sized spots that had been bleeding on his left side.  Tr. 383.  She also

saw where the top layer of skin on the inner side of Hayes' right hand had been

scraped off.  Tr. 383.  She notice that there was blood on Hayes' hands and all

over his clothing.  Tr. 384.  In addition to taking photographs of Hayes, she

collected his clothing and collected swabbings from his hands.  Tr. 384.  Exhibit

77 was identified as a photograph of Hayes' right side of his head, which he

claimed was hit with a brick, though the injuries did not appear to support that

claim.  Tr. 384-85.  Craig also identified Exhibit 78 as a photograph showing the

left side of Hayes' face and some small cuts.  Tr. 385.  At the hospital, Hayes told

Craig that when he and Staci were leaving Three Oaks, "three guys came and

started hitting him or booting him, kicking him, thumping him."  Tr. 386.  Craig

testified that Hayes was unsure whether it was three, four, five, or six men. Tr. 386. Hayes described the men as white males in their 30's and was unable to provide any other details or give an explanation as to why it happened. Tr. 386. Hayes repeatedly stated that he was getting beat or stomped, but would also say that he was not really hurt. Tr. 386-87. When asked about the knife, Hayes claimed he only had a pocket knife, but it was not in his pockets when checked. Tr. 387. Hayes described the knife he had as "all black." Tr. 387. The injuries claimed by Hayes did not match up with the injuries observed by Craig. Tr. 388. Hayes claims the fight ended when he got away and got into the car. Tr. 389. Hayes told Craig that he had not gone back into the bar. Tr. 389.

{¶25} In addition to speaking with Hayes, Craig also had the opportunity to question Staci. Tr. 390. Staci claimed that her elbow was damaged when she was thrown to the ground after jumping on someone after the fight. Tr. 390. Craig collected her clothing as well. Tr. 390.

{¶26} On February 21, 2012, Craig spoke with Hayes again. Tr. 392. Hayes told her that when he and Staci left Three Oaks, he was attacked by three men in the parking lot. Tr. 392. The men started kicking him and hitting him. Tr. 392. Hayes claimed that his hand got cut when he reached down to prevent his assailants from getting his knife, only to discover that it was open. Tr. 393. When Craig asked Hayes if he knew Seifert or Armbruster, he denied that he did. Tr.

394. Hayes was unable to explain how Armbruster's shirt got into his car. Tr. 394. Craig also testified that she contacted Staci to have her look at a photo lineup, but Staci never came in to do so. Tr. 395-96. When they came in for questioning, Craig took DNA samples of Staci and Hayes pursuant to a search warrant. Tr. 396-97. Craig also questioned Hayes as to why he had not called the police about the attack. Tr. 398. Hayes told her he wanted to "assess the situation first" because he was not really harmed. Tr. 398. Hayes admitted that he saw the police officer that had pulled Armbruster over when he left, but did not go over to the officer to report the attack. Tr. 398.

{¶27} On cross-examination, Craig testified that the blood samples taken from Hayes' hands were not tested. Tr. 405. Craig admitted that Hayes' claim that he was attacked was consistent and had not changed. Tr. 405. When questioned about the kind of shoes that were "stomping" him in the face, Hayes repeatedly identified them as boots. Tr. 409-10. At the hospital, Craig went back and forth between Staci and Hayes when asking questions. Tr. 413. One of the injuries sustained by Hayes at some point in time, whether during the fight or the subsequent accident was a dislocated nose. Tr. 414-15.

{¶28} On redirect, Craig testified that Hayes was a suspect in the stabbing because he matched the description and had a lot of blood on him that was not from the accident. Tr. 417-18. Craig also testified that they did not send the

samples from Hayes' hands because BCII refuses to test more than five pieces of biological evidence. Tr. 420. When questioned about the stabbing, Hayes told Craig that "if somebody got stabbed because of him and his wife, he was glad." Tr. 421.

{¶29} The next witness for the State was Ted Manasian ("Manasian"), a forensic scientist at BCII. Tr. 424-25. Manasian testified that he is an expert in fiber analysis, and was declared such by the trial court. Tr. 426-27. In this case, Manasian was asked to examine defects in clothing to determine whether it was caused by cutting or tearing. Tr. 428. The items submitted for testing included the knife, the fibers found on the knife, the camouflage shirt identified as belonging to Armbruster, the sweat jacket identified as belonging to Seifert, and a t-shirt identified as belonging to Armbruster. Ex. 40. Manasian testified that he found numerous fibers on the knife blade. Tr. 437. The fibers on the knife did not match those from the white tank top, but there were fibers from the sweat shirt found on the knife. Tr. 437. There were also additional fibers present that were inconsistent with the two articles of clothing submitted. Tr. 438. Although the "defect" found in the camouflage shirt was not analyzed to determine if it was a cut or a tear, it was noted that its position was consistent with the position of the cut tear found on the white shirt. Tr. 438. The defect in the white shirt was

examined and was determined to be a cut, not a tear. Tr. 438. The defect in the sweat jacket was also determined to have been a cut. Tr. 438.

{¶30} Julie Cox ("Cox"), was a forensic scientist for BCII that testified next. Tr. 443. After numerous questions concerning her qualifications, the trial court declared Cox to be an expert in the field of forensic biology. Tr. 444-45. Cox testified that she took the blood samples from the submissions, determined that they were blood, and prepared them for DNA sampling. Tr. 446. Cox testified that she took samples from the knife, the camouflage shirt, and a pair of jeans belonging to Staci. Tr. 447-48. The samples were identified as blood and sent on for DNA testing. Tr. 449. In addition, Cox had four DNA reference samples, one each from Staci, Hayes, Armbruster, and Seifert. Tr. 449. The results were that Cox found no identified blood on the knife. Tr. 451. The camouflage shirt, the jacket, and the jeans tested positive for the presence of blood. Tr. 451. Those samples were forwarded for DNA testing. Tr. 451. Cox testified that although a knife is used to stab a person, it may not have blood on it if it is removed quickly before the blood has time to deposit. Tr. 451.

{¶31} The final witness to testify during the State's case-in-chief was Erica Jimenez ("Jimenez"), who is also a forensic scientist in the DNA unit for BCII. Tr. 458. The trial court determined that Jimenez was qualified to be an expert witness in the field of DNA analysis and comparisons. Tr. 460. Jimenez testified

that in assault cases, law enforcement may submit up to five items for initial analysis. Tr. 463. If there is not a probative result, additional items may be submitted. Tr. 464. Jimenez testified that the first item examined was the knife and they took DNA from the handle of the knife and from the blade of the knife. Tr. 468. From the blade of the knife, the DNA was a mixture of DNA consistent with both Armbruster and Hayes. Tr. 468. The sample from the handle of the knife was consistent with the DNA of Hayes. Tr. 468. The blood sample from the shirt was consistent with the DNA of Armbruster. Tr. 468. The samples from the collar of the shirt were consistent with DNA from Armbruster along with DNA from Staci. Tr. 468. As for the jacket, the presumptive blood stain was consistent with that of Hayes.[5] Tr. 469. The blood found on Hayes' jeans was consistent with that of Hayes. Tr. 469. The last item was the sample taken from Staci's jeans. Tr. 469. That blood stain was consistent with that of Armbruster. Tr. 469.

{¶32} On cross-examination, Jimenez testified that they do not test all the blood on any item, just limited pieces. Tr. 475. She also testified that they would not take additional samples unless requested to do so by the detective. Tr. 476-77. Jimenez testified that no samples were submitted from shoes, hats, of Hayes' hands. Tr. 477. With DNA, they cannot say who the DNA belongs to conclusively, but rather who may not be excluded as the source. Tr. 478.

---

[5] The owner of the jacket was not identified at this time. However, the jacket sent for testing was a leather jacket that was identified as belonging to Hayes. Ex. 42.

**{¶33}** Following the testimony of its seventeen witnesses, the State rested. Tr. 480. All 79 exhibits of the State were admitted without objection. Tr. 480. Hayes then presented his defense. The first witness for Hayes was Robby Baker ("Baker"). Tr. 490-91. Baker testified that on the night of the incident, he and his wife went with Hayes and Staci to Three Oaks. Tr. 491-92. He and his wife left the bar around 1:30 a.m. Tr. 492. Hayes and Staci left before he did. Tr. 493. When Baker and his wife went to leave, he realized that Staci had left her coat, so he took it with them to return to Staci later. Tr. 495. As they were leaving, Baker saw a car pulled over by law enforcement nearby. Tr. 495. They then left. Tr. 495. The next day Hayes came to his house to get the coat and they discussed the car accident. Tr. 497-98. On cross-examination, Baker testified that he had been parked out front. Tr. 501. He also testified that Staci was very intoxicated that night. Tr. 501-02.

**{¶34}** The second and final witness for Hayes was Staci. Tr. 503. Staci testified that she and Hayes arrived at Three Oaks around 9:00 or 9:30 p.m. Tr. 504. She admitted that there was an incident where she was behaving inappropriately that Hayes had seen. Tr. 504. According to Staci, Hayes was not angry, but joking and they were having a good time. Tr. 504-05. When they left the bar, Baker walked them to the back door and she and Hayes left. Tr. 505. When they were walking to the car, Hayes gave her the keys for her to drive. Tr.

507. When they were six to eight feet away from the car, three men "came around from the left and started punching and hitting on my husband, knocked him to the ground." Tr. 507. Staci testified that the men were kicking and punching Hayes while he was on the ground. Tr. 507. Staci then attempted to pull one of the men off of him, but the man grabbed a hold of her and "slammed" her to the ground. Tr. 508. When she got back up, Staci saw them still attacking Hayes, so she again tried to pull one of the men off of Hayes. Tr. 508. Again, she was thrown to the ground. Tr. 508. Then, the three men just quit striking Hayes, turned and walked away. Tr. 509. Staci then helped Hayes into the passenger seat of the car, and they left to go home. Tr. 509. Within 10 minutes, they were struck head on by another car. Tr. 510. The police arrived, asked questions, and called an ambulance to take Staci to the hospital. Tr. 511. At the hospital, she spoke to Craig. Tr. 511. Although Staci was not able to speak to Hayes at the hospital, she knew that he was being treated and that Craig was talking to him as well. Tr. 512-13. Staci testified that at no point in the evening was Hayes angry with her. Tr. 513-14. Staci also testified that when they went to the police station later, they attempted to make a report of being attacked outside the bar, but were told there was no one available at that time. Tr. 514. Staci testified that Hayes did not stab anyone and that she did not see anyone being stabbed in the parking lot. Tr. 515.

{¶35} On cross-examination Staci admitted that she had consumed one or two drinks right after work. Tr. 516. She also had one beer at dinner and multiple drinks at Three Oaks. Tr. 517. Staci also admitted that she could not describe any of the attackers and that she did not run inside the bar to ask for help. Tr. 517. As to the photo line-up, Staci admitted that she did not return Craig's calls to schedule one. Tr. 519. Staci explained this on redirect by testifying that since her husband was their suspect, she did not want to work with the police. Tr. 522.

{¶36} Following Staci's testimony, Hayes rested his case. Tr. 525. The State chose not to put on any rebuttal witnesses. Tr. 525. On February 28, 2013, the jury returned verdicts of guilty on both counts. Doc. 41. The trial court accepted and journalized the verdicts on February 28, 2013. Doc. 41. The first sentencing hearing was held on April 18, 2013, but was continued to resolve an issue with restitution. Doc. 45. A second sentencing hearing was held on April 26, 2013, but the issue of restitution remained unresolved, so the hearing was again continued. Doc. 47. The final sentencing hearing was held on May 24, 2013. Doc. 51. Following the hearing, the trial court sentenced Hayes to seven years in prison on count one and five years in prison on count two, with the sentences to run concurrently. *Id*. at 2. The trial court also ordered Hayes to pay restitution in the amount of $6,633.12. *Id*. at 3. Hayes filed his timely notice of

appeal on May 28, 2013. Doc. 54. On appeal, Hayes raises the following assignments of error.

## First Assignment of Error

**[Hayes'] conviction was not supported by the manifest weight of the evidence.**

## Second Assignment of Error

**The counsel for [Hayes] provided ineffective assistance of counsel.**

{¶37} In the first assignment of error, Hayes claims that his conviction was against the manifest weight of the evidence. "A reviewing court may find a verdict to be against the manifest weight of the evidence even though legally sufficient evidence supports it." *State v. Group*, 98 Ohio St.3d 248, 2002-Ohio-7247, ¶76, 781 N.E.2d 980.

> **A reviewing court considering a manifest-weight claim "review [s] the entire record, weighs the evidence and all reasonable inferences, [and] considers the credibility of witnesses."** *State v. Martin* **(1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717. The question for the reviewing court is "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against conviction." Id. See** *Thompkins,* **78 Ohio St.3d at 387, 678 N.E.2d 541.**

*Id.* at ¶77. Although the appellate court acts as a thirteenth juror, it still must give due deference to the findings made by the jury.

> **The fact-finder, being the jury, occupies a superior position in determining credibility. The fact-finder can hear and see as well as observe the body language, evaluate voice inflections, observe hand gestures, perceive the interplay between the witness and the examiner, and watch the witness' reaction to exhibits and the like. Determining credibility from a sterile transcript is a Herculean endeavor. A reviewing court must, therefore, accord due deference to the credibility determinations made by the fact-finder.**

*State v. Risch*, 3d Dist. Wyandot No. 16-10-14, 2011-Ohio-3633, ¶5 (quoting *State v. Thompson*, 127 Ohio App.3d 511, 529, 713 N.E.2d 456 (1998)).

{¶38} In this case, Hayes was charged with two counts of felonious assault in violation of R.C. 2903.11(A)(2),(D)(1)(a). To obtain a conviction on these charges, the State was required to prove beyond a reasonable doubt that Hayes had 1) knowingly, 2) caused or attempted to cause physical harm to another, 3) by means of a deadly weapon, and 4) it occurred in Seneca County. R.C. 2903.11(A)(2).

{¶39} The first count of the indictment alleged that Hayes committed felonious assault against Armbruster. Armbruster testified that he went back to help Seifert and as he was walking, he was stabbed. Seifert testified that he saw Hayes pull something shiny out and stab Armbruster. Hayes admitted to having a knife, but claims he lost it. A knife was found at the scene. When the DNA from

the knife was tested, the blade had a mix of DNA that was consistent with that of Armbruster and Hayes. The DNA on the handle of the knife was consistent with that of Hayes. Additionally, the blood found on Staci's jeans was consistent with that of Armbruster. The shirt, identified by Armbruster as the one he wore the night of the incident was found bloody and in the back of Hayes' car. Hayes had no explanation as to how the shirt got there. Craig testified that Hayes told her he was glad somebody got stabbed. Lang testified that Hayes told him that he hoped Armbruster was hurt bad. In contradiction, Staci testified that Hayes was attacked by three men and that he had not stabbed anyone. She seemed to be implying that Armbruster and Seifert must have been two of the three men who attacked Hayes. However, Craig testified that Hayes' story of the attack was not consistent with the physical evidence. Hayes' version of events was also not consistent with the testimony of Lovas who testified that she saw Hayes punching the white van, which was identified as belonging to Armbruster. The evidence presented does not weigh heavily against conviction and does not indicate that the jury lost its way. Thus, the verdict as to count one is not against the manifest weight of the evidence.

{¶40} In the second count of the indictment, Hayes was charged with committing felonious assault against Seifert. Unlike the first count where the victim suffered physical harm, there was no allegation of physical harm to Seifert.

Instead, the State was relying on the fact that Hayes attempted to cause physical harm to Seifert. Seifert did not testify that Hayes attempted to cause physical harm to him with the knife. However, there is evidence that this occurred. Vallery identified Exhibits 11 and 12 as photographs of a jacket recovered from Seifert. Tr. 191. Exhibit 11 shows that there is a defect in the jacket which could be either a tear or a cut. Vallery also identified that jacket itself, Exhibit 38, as the jacket worn by Seifert the night of the attack and testified that it was sent to BCII for analysis. Tr. 201. Manasian testified that he had examined the jacket, identified as belonging to Seifert and being worn the night of the incident. Manasian testified that the defect in the jacket was the result of a cut, not a tear. Tr. 438. In addition, Manasian examined fibers taken off the knife. Manasian found multiple fibers on the knife blade which were consistent with that found in the jacket. Tr. 438. There was also testimony by Jimenez that the only DNA found on the handle of the knife was consistent with that of Hayes. Although there was no direct evidence that Hayes had attempted to harm Seifert with the knife, there was circumstantial evidence to that fact. A reasonable juror could infer from the evidence that Hayes had attempted to cause physical harm to Seifert with the knife by the fact that there was a cut to the jacket worn by Seifert at the time of the incident and the knife that belonged to Hayes, with only Hayes' DNA on the handle, had matching fibers on its blade. The evidence presented does not

weigh heavily against conviction and does not indicate that the jury lost its way. Thus, the verdicts are not against the manifest weight of the evidence. Therefore, the first assignment of error is overruled.

{¶41} In the second assignment of error, Hayes claims that his trial counsel was ineffective.

> **In evaluating whether a petitioner has been denied effective assistance of counsel, this court has held that the test is "whether the accused, under all the circumstances, * * * had a fair trial and substantial justice was done."** *State v. Hester* **(1976), 45 Ohio St.2d 71, 74 O.O.2d 156, 341 N.E.2d 304, paragraph four of the syllabus. When making that determination, a two-step process is usually employed. "First, there must be a determination as to whether there has been a substantial violation of any of defense counsel's essential duties to his client. Next, and analytically separate from the question of whether the defendant's Sixth Amendment rights were violated, there must be a determination as to whether the defense was prejudiced by counsel's ineffectiveness." State v. Lytle (1976), 48 Ohio St.2d 391, 396–397, 2 O.O.3d 495, 498, 358 N.E.2d 623, 627, vacated on other grounds (1978), 438 U.S. 910, 98 S.Ct. 3135, 57 L.Ed.2d 1154.**

> **On the issue of counsel's ineffectiveness, the petitioner has the burden of proof, since in Ohio a properly licensed attorney is presumably competent. See Vaughn v. Maxwell (1965), 2 Ohio St.2d 299, 31 O.O.2d 567, 209 N.E.2d 164; \*\*915 State v. Jackson, 64 Ohio St.2d at 110–111, 18 O.O.3d at 351, 413 N.E.2d at 822.**

*State v. Calhoun*, 86 Ohio St.3d 279, 289, 1999-Ohio-102, 714 N.E.2d 905.

> **"Judicial scrutiny of counsel's performance is to be highly deferential, and reviewing courts must refrain from second-guessing the strategic decisions of trial counsel. To justify a**

> **finding of ineffective assistance of counsel, the appellant must overcome a strong presumption that, under the circumstances, the challenged action might be considered sound trial strategy."** **(Citation omitted.)**

*State v. Sallie*, 81 Ohio St.3d 673, 674, 693 N.E.2d 267 (1998).

{¶42} In support of his argument, Hayes claims that his counsel was ineffective for 1) failing to have other items of evidence tested and 2) for failing to raise the affirmative defense of self-defense. An attorney's determination of what evidence to present at trial is a matter of trial strategy. *State v. Hester*, 10th Dist. Franklin No. 02AP-401, 2002-Ohio-6966. Although Hayes claims that counsel should have had various items tested for additional DNA, there is nothing to suggest that it would have been helpful. For example, if his counsel had requested that the blood from Hayes hands be tested and the results indicate that the blood belonged to Armbruster, how would that have helped his case? If the results would have come back and shown that the blood was his own, that would have only shown that he was injured, which the jury already knew. This would not have shown that he did not stab Armbruster, only that the swab was his own blood. Additional testing would not have changed the fact that Hayes' knife was found at the scene with only DNA consistent with Hayes on the handle and with a mixture of DNA consistent with Armbruster and Hayes on the blade. Without

some showing that the missing evidence would have assisted in the presentation of Hayes' defense, this court cannot second guess the trial strategy of counsel.

{¶43} Hayes also claims that counsel was ineffective for failing to raise a claim of self-defense. When a claim of self-defense conflicts with the defense presented, it is sound trial strategy not to raise a claim of self-defense. *State v. Marshall*, 175 Ohio App.3d 488, 2008-Ohio-955, ¶86, 887 N.E.2d 1227 (1st Dist.). In this case, Hayes claimed, through his statements to the police and the testimony of Staci, that the events did not happen. Hayes claimed that he was attacked in the parking lot by three men, but that he never pulled out his knife or stabbed anyone. This argument would have been contradictory to an argument that there was a fight, but the aggressor was Seifert and Armbruster, so he stabbed them to protect himself or Staci. Thus, the decision not to request an instruction on self-defense was a matter of trial strategy.

{¶44} Since trial counsel did not err by not requesting additional testing and not raising self-defense as an affirmative defense, there was no violation of counsel's duties. The first prong of the test is not met. In addition, appellate counsel has not presented any evidence to indicate that the outcome would have been different if trial counsel had done the above. Thus, the second prong of the test is also not met. The second assignment of error is overruled.

{¶45} Having found no error prejudicial to appellant as to the particulars of the errors assigned and argued, the judgment of the Court of Common Pleas of Seneca County is affirmed.

*Judgment Affirmed*

**PRESTON and ROGERS, J.J., concur.**

**/hlo**